# THE PHOENIX NATIONAL BANK *vs.* THE UNITED STATES SECURITY TRUST COMPANY, TRUSTEE.

First Judicial District, Hartford, January Term, 1924.

WHEELER, C. J., BEACH, CURTIS, KEELER and MALTBIE, Js.

Whether a right of passway appurtenant to a tract of land which is afterward divided and sold to different purchasers is thereby extinguished with respect to one or more of the several subdivisions, or continues to be appurtenant to each of them, depends upon whether the passway still remains available to the subdivision in question either because the two are contiguous, or because the owner of such subdivision is able to reach the passway through other intervening land over which he has a legal right of passage. If such availability survives, the passway is still appurtenant to the subdivision in question; if it does not—as in the present case—the right of way is extinguished with respect to that piece as a result of the partition and sale of the original tract.

The division and sale of the original tract in the present case cut off the piece in question from physical contact with the passway. *Held* that this severed piece could hereafter enjoy its original easement only in one of three ways: by the specific creation of a new right of way over the land between it and the passway; by such a right of way arising from necessity; or by a way over such intervening land arising from an implied grant based upon its prior, open, visible, continued and necessary use in connection with the severed piece; and that inasmuch as the facts in the present case did not show the acquisition of a right to pass over the intervening land by any one of these methods, the defendant had no right to use the passway in question in connection with the severed portion of the original tract.

The defendant insisted that the right of access from the land afterward severed and owned by it to the passway in question, was only suspended or dormant, and that as the defendant had recently acquired title to the intervening land also, the union of titles had restored the original situation with all its incidents. *Held* that there was no authority for such a contention, which, if sanctioned, would strikingly contravene the policy of our recording system.

Argued January 4th—decided April 15th, 1924.

SUIT seeking a declaratory judgment as to the rights of the parties in the use of a certain gangway claimed

as appurtenant to land owned by the defendant, and as to the use of this gangway in connection with a part of said land, brought to and reserved by the Superior Court in Hartford County, *Maltbie, J.*, upon an agreed statement of facts, for the advice of this court. *Superior Court advised to render judgment declaring that defendant has no right to use the gangway in connection with the rear part of piece F.*

The situation of the lands in question and of the gangway in connection therewith, can best be understood by reference to two maps or diagrams of the same, which are incorporated in the facts agreed upon by the parties and designated as maps one and two.  See page 624.  Map No. 2 represents all of the land to be considered as the same was owned and bounded in the early part of the year 1825, and map No. 1 represents the same land as it was bounded and owned at the time of the institution of this action.

In 1825 the plaintiff owned a piece of land in the city of Hartford, about forty-four feet in width and three hundred feet in depth, appearing on Map. No. 2 as pieces marked S, V, X and Y.  The westerly portion of this tract comprises the rear or southerly parts of pieces E and F on Map No. 1.  At the same time William Hills owned a lot of land on the southwest corner of Main and Asylum streets in Hartford designated as T, U and W on Map 2, and including D on Map 1.

On May 6th, 1825, the plaintiff conveyed to William Hills that portion of its land marked X and Y on Map 2. The premises are described in his deed as commencing at a point " in the center of a twelve-foot gangway, now to be reserved for the use of the parties to this contract." On May 7th, 1825, the next day, Hills conveyed to the plaintiff the piece U on Map 2, describing it as "the easterly half of a 12-feet gangway leading from Asylum Street thru my own land, westward of the house now

Phoenix Nat. Bank *v.* United States Security Trust Co.

MAP No.2

MAP No. 1

occupied by Samuel Whittlesey, and terminating south at the land of the Phoenix Bank aforesaid." On said May 7th, the plaintiff and Hills executed leases by one of which the plaintiff leased to Hills the easterly portion of the gangway, U and V on Map 2, and by the other of which Hills leased to the plaintiff the westerly part or portion of the gangway, W and X on Map 2. Both of these leases were in perpetuity. The lease from the plaintiff to Hills is stated to be "in consideration of said Hills leasing in the same manner [to the plaintiff] an

equal quantity of land adjoining, to be used by the two contracting parties, their heirs, executors, administrators, successors and assigns for their mutual accommodation, as a passway, common to the two parties, their heirs, executors, administrators, successors and assigns forever." The lease of Hills to the plaintiff covering the pieces W and X on Map 2 was in the same terms *mutatis mutandis* as the lease just referred to from the plaintiff to Hills.

On July 17th, 1826, Hills purchased from Thomas Belden a lot of land fronting on Asylum Street adjoining and in front of the premises purchased by him from the plaintiff. The property acquired from Belden is marked Z on Map 2. Hills at this date appears as the owner of Y and Z on Map 2. August 7th, 1826, Hills conveyed to Amos Collins the westerly portion of the land conveyed to him by Belden, and a mutual gangway, designated as I on Map 1, was then established at the westerly part of land of Hills, between pieces F and G on Map 1. On August 15th, 1828, Hills conveyed to Samuel Tudor, Jr., all of his land fronting on Asylum Street west of the center of the gangway (B and C on Map 1), and marked E and F on Map. 1. The deed of conveyance contained a reservation as follows: "Reserving and excepting in favor of myself and The Phoenix Bank, and assigns, the rights and privileges now owned by us in common in said gangway and granting to the said Tudor the privilege of the east half of said gangway in common with us to use the same, so that the same shall continue a mutual gangway."

Samuel Tudor died seised of pieces E and F on Map 1, and by his will devised them to certain of his descendants who conveyed the same as hereinafter stated. William T. Pratt and others, the heirs or devisees of Samuel Tudor, on August 27th, 1880, conveyed to William W. Larrabee piece F on Map 1, and at the time of the con-

veyance there stood upon the premises, according to the language used in said deed, "a block of brick buildings . . . comprising two dwelling-houses and two stores." In this deed no specific mention was made of any rights in the gangway B and C on Map 1, nor was any specific mention made of any right of way across the easterly half of the Tudor tract, piece E on Map 1, but the deed contained the usual language as to appurtenances. On August 30th, 1880, William W. Larrabee conveyed piece F on Map 1 to Gilbert F. Heublein, and on March 23d, 1916, Gilbert F. Heublein conveyed the same to G. F. Heublein, Inc. These two deeds carried the usual language with reference to appurtenances, and also expressly granted rights in the gangway to the west of piece F on Map 1. On February 10th, 1922, G. F. Heublein, Inc., conveyed to Arthur L. Foster piece F on Map 1. No reference was made in the deed to the gangway B and C on Map 1, but the deed carried the usual language as to appurtenances, and also expressly granted rights to the gangway on the westerly side of piece F and also conveyed the existing rights of the grantor "if any there be, in gangway on the easterly side of the premises." Between the building on piece F on Map 1 and the building on piece E on Map 1, there has been for many years a strip of land about ten feet wide open and not built upon, marked piece H on Map 1. On October 30th, 1911, Tudor S. Rogers, heir-at-law or devisee of Samuel Tudor, conveyed an undivided half interest in land marked piece E on Map 1 to Sanford G. Freeman, and on November 7th, 1911, Sanford G. Freeman conveyed this one-half interest in piece E to Arthur L. Foster, and on the same date Sanford G. Freeman, as guardian of Charles Hoadley Tudor, heir-at-law or devisee of Samuel Tudor, conveyed the remaining undivided one-half interest in piece E to Arthur L. Foster. In 1911, Foster was and had been since 1884,

by virtue of a series of leases, the lessee and occupant of piece F on Map 1.

Between the year 1880 and the year 1885 additions were made to the buildings on the easterly half of the Tudor tract, piece E on Map 1, in the rear, in such manner as to prevent vehicular traffic between the gangway on the easterly side of the tract and the westerly half of the Tudor tract then owned by Heublein, piece F on Map 1, and while an open space at the rear of piece E on Map 1 remained about three feet six inches in width, this space was not at any time during its existence used as a passway from the mutual gangway marked pieces B and C on Map 1 to piece F on Map 1. The buildings at the rear of the building on piece E on Map 1 have recently been removed, so that at the present time there is a wide open space at the rear of the building which could conveniently be used for passage between the gangway and piece F on Map 1. After 1880, when title to piece F on Map 1 became vested in a different owner than the owners of piece E on Map 1, and while title to the two pieces was vested in separate owners, at no time did the owners of piece F have any right of way or of passage across the land bounding piece F upon the south, and neither during the year 1880 nor since has there been any deed or conveyance, excepting only the lease hereafter mentioned, making specific or express mention of a right of way in favor of piece F over piece E on Map. 1. Arthur L. Foster died in May, 1922, and under the terms of his will the defendant is trustee of the property conveyed to him as aforesaid. Arthur L. Foster, in 1922, after he acquired title to piece F on Map 1, closed the gangway between the pieces marked F and G on Map. 1.

The junction of Main and Asylum streets in Hartford is the center of the business section of the city. The plaintiff's premises on Main Street have been used

for over a century as the location of its building for banking and office purposes. The property on Asylum Street belonging to the defendant, westerly of the gangway B and C on Map 1, is business property used for retail trade. On that portion of the defendant's premises, piece E on Map 1, there stands a building several stories high which is used for retail trade, and fronts on Asylum Street, and the building, together with that portion of the tract which lies south and in the rear of the building, has been leased by the defendant to Kaufman Hats, Incorporated, a New York corporation, by lease dated December 9th, 1922, for a twenty year term commencing April 1st, 1923, subject, however, to the reservation by the defendant of a right of way over the southerly ten feet of that part of the defendant's premises leased to Kaufman Hats, Inc., which right of way is for the benefit of the defendant or any lessee or occupant of premises of the defendant lying west of the property leased to Kaufman Hats, Inc. In this lease to Kaufman Hats, Inc., the defendant also reserves the right in the mutual gangway B C on Map 1, for access for itself and other tenants to other properties owned by the defendant west of the premises leased to Kaufman Hats, Inc. There is a narrow strip of land, a part of piece E on Map 1, lying west of the building on piece E which is open and unbuilt upon and not subject to the lease to Kaufman Hats, Inc.

On that portion of the defendant's premises hereinbefore referred to as piece F on Map 1, there stands a building which occupies the entire westerly half of the tract except a strip of land a few feet wide along the easterly portion, and this building has been leased for a period of fifteen years from October 1st, 1922, to A. L. Foster Company, Incorporated, engaged in the retail clothing business. The defendant has agreed with A. L. Foster Company, Inc., that the strip of

land designated as piece H on Map 1 may be used by the corporation as a passway to the building leased to it, but the agreement provides that the strip of land may be built upon by the defendant if the defendant will make available to A. L. Foster Company, Inc., other means of access to and egress from the rear of the building leased to it. The defendant is desirous of closing the open space or gangway designated as piece H on Map 1 which lies between pieces E and F on Map 1 by building thereon, and claims the right to grant to the A. L. Foster Company, Inc., rights of way in the gangway designated as pieces B and C on Map 1. The defendant proposes to permit A. L. Foster Company, Inc., to use the mutual gangway B and C on Map 1, and the strip of land ten feet wide across the rear of the premises leased to Kaufman Hats, Inc., piece E on Map 1, as a means of access to and egress from the building leased to A. L. Foster Company, Inc.

The parties are in dispute as to the right of the defendant to use and permit A. L. Foster Company, Inc., to use the mutual gangway B C on Map 1, for passage and repassage in going to and from the rear of the building leased to it, piece F on Map 1.

This court is asked to declare and advise the Superior Court: (1) Whether the right to use the gangway marked B and C on Map 1 as appurtenant to the rear of piece F on Map 1 terminated when piece F was conveyed to Larrabee; (2) whether the right to use this gangway as appurtenant to the rear of piece F is a right which may now be lawfully exercised by the defendant trustee or its lessees.

*Edward M. Day,* with whom was *Allan K. Smith,* for the plaintiff.

*Francis W. Cole* and *Barclay Robinson,* with whom, on the brief, was *Benedict M. Holden,* for the defendant.

KEELER, J. The defendant claims that it has a right as trustee owner of the pieces E and F, to provide, by means of a passway along the easterly side of piece E, for access to the gangway C B, and to use this gangway in connection with the rear portion of piece F for all purposes to which the gangway may legally be put. The defendant contends that when in 1880, the piece F was by William T. Pratt and others conveyed to William W. Larrabee, and thus severed in title and ownership from piece E, it still had as appurtenant an easement over the gangway. It bases its contention upon the rule that an easement is appurtenant to any part of a dominant estate, and that when it is divided by deed, devise or other legal method, each of the parts resulting from such division may use the easement as far as applicable.

This rule is well established, and no question is made by plaintiff as to its correctness; the controversy between the parties involves its scope and application.

The leading case of *Hills* v. *Miller*, 3 Paige Ch. (N. Y.) 254, 257, states the rule as follows: "As the right is annexed to the estate, for the benefit of which the easement or servitude is created, the right is not destroyed by a division of the estate to which it is appurtenant. And the owner or assignee of any portion of that estate may claim the right, so far as it is applicable to his part of the property, provided the right can be enjoyed as to the separate parcels without any additional charge or burden to the proprietor of the servient estate." This case is referred to and the extract above given often quoted in subsequent decisions and by text-writers, as a foundation case and a point of departure in all subsequent discussions upon this general topic. See 19 Corpus Juris, 948; Jones on Easements, § 30; 9 R. C. L. 803, § 59. The English law is the same. Goddard on Easements (8th Ed. 1921) 390.

It is unquestionably the law of this State. *Sweeney* v. *Landers, Frary & Clark*, 80 Conn. 575, 69 Atl. 566; *Blanchard* v. *Maxson*, 84 Conn. 429, 80 Atl. 206; *Alling Realty Co.* v. *Olderman*, 90 Conn. 241, 96 Atl. 944.

In Corpus Juris as above cited, the principle as stated in *Hills* v. *Miller, supra,* is adopted almost *in verbis* as a statement of the law, and then by way of explanation, founded on other cases cited, that work expands and explains the expression "so far as it is applicable to his part of the property," by adding, "and it inures to the benefit of the owners of all subdivisions so situated that it can be used."

The position of the defendant involves the claim that the easement persists and inheres in the piece F after subdivision absolutely, unless as to it the easement has been extinguished and negatived by express terms. No case has been called to our attention by counsel, and our examination discloses none that supports this position. Such a claim was made in *Dawson* v. *St. Paul F. & M. Ins. Co.,* 15 Minn. 136. Adopting the excellent summary of that case contained in plaintiff's brief, it appeared therein that there was a rectangular piece of land through which, on the easterly side, a passway ran in a northeasterly and southwesterly direction, and which was called St. Charles Street. Two lots were sold abutting this street, one called the Cavalier Lot and one the Hopkins Lot. On January 22d, 1849, Jackson conveyed to Franklin Steele all of the original lot east and west of St. Charles Street excepting the Hopkins Lot and the Cavalier Lot, including St. Charles Street. On August 16th, 1851, Franklin Steele conveyed to Jeremiah Mahoney, a tract of land to the west of the Hopkins Lot and the Cavalier Lot not abutting on St. Charles Street. All the deeds in question referred to St. Charles Street as a boundary or starting point, and each lot was conveyed

with appurtenances. Jeremiah Mahoney conveyed his lot to the plaintiff in the case. The court held that a right of way existed in favor of the Hopkins and Cavalier lots which abutted thereon, but not on the Mahoney Lot, not so abutting. The claim made in the case was the bald one of inherent right of way, apart from any necessity, since the Mahoney Lot had a frontage on one side upon another street, and was not dependent on St. Charles Street for access.

The recent case of *Cetlin* v. *Bradford*, 242 Mass. 434, 136 N. E. 119, decided in 1922, is to the same effect. A partition of certain land in Newburyport was as delineated on a certain plan which showed a division into lots A, B, C and D, and a passageway through the tract was made appurtenant to them, having B and C on one side of it and A and D on the other side. In the opinion the court says: "The trustees under Mackinney's will on April 2, 1908, conveyed parts of lots B and C to Timothy Harrington. The northerly line fixed by the deed was parallel and three feet distant from the northerly end of the building on the lot. The line so determined was distant two feet southerly from the southern line of the way. No reference is made to the way in this deed and as the premises did not abut on it the grantee got no interest in the fee or right thereover." In this case, as in that last noted, the tract conveyed, and in favor of which an easement was claimed, had on another side a street entrance, so that no claim of a way by necessity was involved. The claimed easement was put squarely upon a right of way inhering after a division of the dominant estate in a part thereof not abutting on the way, and was held not to exist.

In *Alling Realty Co.* v. *Olderman*, 90 Conn. 241, 96 Atl. 944, there was a question of easement involved in the sale of a tract of land which abutted on the east

on a street and on the west upon a passway. The part of the tract fronting on the street was sold with no reservation of a right of way across the remainder of the tract facing on the passway. The grantee, however, had a lot adjoining the tract which he had purchased, known as the Beardsley lot, across which he might reach the passway. The court held that his easement as appurtenant to the tract purchased had not been destroyed, but remained effective by virtue of his ownership of the Beardsley lot, and in its opinion said: "The deed of Kelly to the defendant of the front part of the lot did not, either by virtue of the division or of its detachment from the portion adjoining the passway, destroy the easement as appurtenant to it, or deprive it of the benefit of the easement in so far as there might exist means for its enjoyment. In the present case such means existed through access to the way over the Beardsley lot."

In some States it has been held that an easement appurtenant to a parcel of land must either begin or end upon the land, but this court has held such a prerequisite not essential, and established availability for use in connection with the dominant estate as the correct test of appurtenance. In *Graham* v. *Walker*, 78 Conn. 130, 61 Atl. 98, the opinion states: "An appurtenant way ordinarily does touch the close to and from which it leads, and that it should is commonly essential to its enjoyment; but it is not always thus essential, and when not, the dominant may be separated even at a long distance from the servient tenement." In the case cited the distance between the dominant and servient tenements was covered over a public highway.

From the consideration of all of the cases above cited, there emerges as the true rule for determining the appurtenance of an easement of way in favor of a parcel

of land resulting from a subdivision, the existence of the fact of applicability to such part of the subdivided property, a situation so that it can be used in connection therewith. Having regard to the effect of the two cases last cited, we may say that in this jurisdiction the test is availability of the way to the dominant land either by its directly abutting on the same, or by a capacity of reaching it over other land over which the dominant owner has a legal right of passage.

The defendant further claims that the facts in the instant case satisfy the requirement just stated, in that there arose by virtue of the conveyance of piece F in 1880, an appurtenant right of way over the piece E, and that this conveyance did not terminate the easement theretofore obtaining in favor of F while an integral part of the tract Y on Map No. 2.

When such a subdivision occurs as took place in the present case, a part of an original tract which is cut off from physical contiguity to a gangway or passway, can enjoy the easement which it originally had over such a way in three ways: by a specific creation of a new easement of way over the land intervening between it and the existing passway; by such a way arising from necessity; or by a way over such intervening land deriving its validity as an appurtenance implied from use theretofore made of such intervening land in connection with the land cut off by the conveyance. In the deed from Pratt and others to Larrabee in 1880, there is clearly no new easement of way created across piece E in favor of piece F, nor can any way of necessity arise, since the rear part of piece F could be reached from Asylum Street directly over its whole depth, and also there was appurtenant to it the gangway marked I on Map 1. The defendant must, therefore, rely upon an impled easement or, as it is termed in the books, a quasi-easement.

We have in the case of *Whiting* v. *Gaylord*, 66 Conn. 337, 34 Atl. 85, an exhaustive and learned opinion by CHIEF JUSTICE ANDREWS in which the topic of quasi-easements is examined, with a very full consideration of American and English cases down to the date of the opinion (1895). The conclusion was reached that an easement not specially mentioned in the conveyance of the land will not arise by implication from prior use of the land in connection with a larger tenement prior to subdivision, unless such use is open, visible, continuous and necessary to the enjoyment of the estate granted, and that an intending purchaser is under no burden or obligation to ascertain the existence of such an easement, for in order for it to be implied it must be open and visible in such a way as to be apparent to an ordinary observer.

There is certainly nothing in the facts appearing in the instant cast to indicate an open, visible, apparent, continuous and necessary enjoyment by the owners of the piece F of a passageway across the southerly side of piece E. On the contrary, it appears that between 1880 and 1885 such additions were made to the buildings on piece E that there remained upon its rear an open space of only about three and one half feet, and that this space was not at any time during its existence used as a passway from piece F to the mutual gangway B, C. To an ordinary observer no passway would be suggested by examining this strip, and if he also observed, as he might, that piece F had a frontage on Asylum Street by which the highway might be reached from any point of its area, and if, in addition to such an examination, he consulted the land records of the town of Hartford and discovered the existence of an easement in favor of this piece over the gangway marked I, the idea of an implied easement of way over the southern part of piece E,

would certainly not be obvious or convincing. We therefore conclude that when tract F was sold in 1880 without the express creation of an easement in its favor over piece E, it lost the right which it had as part of the piece Y on Map 2.

The claim that this original right of access to the gangway existing in favor of piece F became dormant or suspended after 1880, but was revived when the ownership of pieces F and E became reunited in 1922, and the owner was thus able to create in favor of piece F an easement of passage across the south end of piece E, has no foundation in reason or authority. In *Whiting* v. *Gaylord*, 66 Conn. 337, 349, 34 Atl. 85, we said: "Implied grants of land, or of easements, or of any interest in land, are allowed here when allowed at all, to a very much more limited degree than in the other States. These decisions are in accordance with what has always been the policy of our recording system, that the title to all interests in land shall appear on the land records, so that they may be easily and accurately traced. . . . We think this plain policy should be adhered to, so that men will know what they have to trust, and can place confidence in the language of all conveyances as they find them recorded." It would strikingly contravene the policy just enunciated, were we to hold that the owner of a dominant estate might possess an easement founded on matters *in pais* which had arisen in a time long past, and hold the same in abeyance as his interest or caprice might dictate, and at a future time when all of the indicia of its existence had ceased to be evident, successfully maintain the easement as against a person who could have had no warning or notice regarding its inception and continuance.

The view which we have taken regarding the existence of the claimed easement, renders it unnecessary to consider the claims of the plaintiff as to abandon-

ment of the easement and undue burden upon the servient estate. The first question propounded for our advice should be answered "Yes," and the second question should be answered "No," and the Superior Court is advised to render a declaratory judgment in accordance with these answers.

In this opinion the other judges concurred.