THE STAMFORD EXTRACT MANUFACTURING COMPANY ET AL. *vs.* THE STAMFORD ROLLING MILLS COMPANY.

Third Judicial District, New Haven, June Term, 1924.

WHEELER, C. J., BEACH, CURTIS, KEELER and KELLOGG, Js.

Assignments of error in the form of a *quære:* "Whether or not the court erred," etc., are not in proper form, but may be considered by this court in the exercise of its discretion, if the importance of the case so demands.

A riparian owner has the privilege of using the water which flows in the stream adjacent to his lands, but he must exercise the privilege in a reasonable manner so as not to destroy, or render useless, or materially diminish or affect the lawful application of the water by the proprietors above or below him.

The rights of a riparian owner to the customary flow of a stream may be affected, both as to quantity and quality, by rights acquired by prescription.

The fact that a riparian owner is using the water for a special purpose does not affect his general rights which he may protect by suit even though he is not exercising them.

The injurious effect upon the quality of river water for drinking and domestic purposes, which results inevitably from increased population along its banks, affords no basis for legal complaint.

In the present case, the plaintiff company had used the water of the Noroton River for many years in its process of manufacturing extract dyes, but in 1917 the water became unfit for that purpose by reason of the presence therein of metals in solution, which resulted in part from the use of the water by the defendant company in its

manufacture of brass and bronze castings. As soon as this condition was brought to its attention, the defendant, at great expense, reduced its pollution of the water to a negligible degree by immediately installing and thereafter maintaining the most approved scientific devices for purifying the water discharged from its plant, and the plaintiff again used the water successfully until 1921 when the contamination reappeared. During the past ten years, several new factories using the water of the river have been constructed, and the population along the river banks has steadily increased, thus multiplying the possible sources of contamination. *Held* that the trial court's finding that the defendant's use of the water was reasonable and was not causing any substantial pollution was the only conclusion to be legally and logically drawn from the subordinate facts found.

Argued June 3d—decided July 28th, 1924.

SUIT to restrain the defendant from the alleged pollution of the waters of a stream, and for damages, brought to and tried by the Superior Court in Fairfield County, *Maltbie, J.;* facts found and judgment rendered for the defendant, and appeal by the plaintiffs. *No error.*

*George D. Watrous* and *Warren F. Cressy,* for the appellants (plaintiffs).

*Charles D. Lockwood* and *Raymond E. Hackett,* for the appellee (defendant).

CURTIS, J. The assignments of error are all in the form, "whether or not the court erred," etc., and are not in proper form, and have the result of stating the claimed errors in an indefinite way not clearly related to the findings. We have disapproved of such assignments many times. *Antel* v. *Poli,* 100 Conn. 64, 68, 123 Atl. 272. However, we exercise our discretion and consider the errors claimed in so far as they seem material, because of the importance of the case.

The plaintiffs and their predecessors in title are the

lowest riparian owners on the Noroton River in Stamford. They are also the owners of an artificial storage reservoir or pond, known as Kleinfelter's Pond, and of a strip of land surrounding the pond. This pond is an enlargement of the river water-course, through which the river still flows. The plaintiffs have a plant for the manufacture of extract dyes at the mouth of the river, about three quarters of a mile below the pond. The plaintiffs, for more than a half century, have been engaged in the manufacture of logwood extract dyes, and tanning extracts; a portion of the logwood extract is put through a process of oxidization and is then known as hematin. The manufacture of these products is a delicate operation requiring pure water of uniform quality. At the height of operations they have used as much as a half million gallons of river water in twenty-four hours. The Noroton River is still capable of furnishing to the plaintiffs a sufficient volume of water, which could be used in their business as heretofore, were it not for the pollution of the stream by various waste products. The right to receive and use the water of the river has been and is of great value to the plaintiffs. They have continuously used the water from Kleinfelter's Pond for this and other purposes. The water was drawn from the pond to their plant through pipes over a right of way duly acquired upon a highway along the river. The products manufactured are not affected by bacterial waste from sewage, but the presence of copper, iron or zinc in metallic form, in sufficient amounts, and of any of these metals in solution in very much smaller amounts, changes the color and affects the purity and marketability of the products.

Up to 1914, the water from Kleinfelter's Pond was used by the plaintiffs for the purpose of extracting dyes without any trouble from its condition. The quantity

of water in the pond was ample and its quality especially adapted to the production of dyes. About 1917, the defendant company was organized and acquired a plant about two and one quarter miles above Kleinfelter's Pond, and greatly enlarged it for the production of war materials, and has ever since carried on the business of making castings of brass and bronze, and is now employing from three to five hundred hands.

A company, the Jelliffe Company, has operated a factory on the Noroton River at New Canaan, several miles above the plaintiffs' plant, for a great many years, for the manufacture of iron and galvanized iron screens. Near it, metal scraps and iron refuse are left on the bank of the river and find their way in considerable quantities into the river.

About two miles above Kleinfelter's Pond, the Phillips Chemical Company has operated a factory near the banks of the river, and for many years before 1914, and since, has manufactured milk of magnesia, zinc ointment and other products. The waste from this factory, including at times sodium sulphate and compound of magnesia, iron, zinc and aluminum and certain organic compounds, finds its way into the river.

Aside from these factories, the river was, until about 1914, free from manufacturing plants. During the last ten or twelve years, however, a very considerable change has come over the lands bordering and along that part of the river which is located between one and five miles above the plant of the plaintiffs. Two settlements, both near the river and within the town of Stamford, known as "Glenbrook" and "Springdale," have increased and are increasing rapidly in population, and neither has a sewerage system. Close to Kleinfelter's Pond, a number of houses have been built, and some of them drain their sewage directly into the pond.

These changes have resulted in a considerable pollution of the waters of the pond and river from sewage and from the throwing of refuse, tin cans and the like into its waters. A number of manufacturing plants have also been established upon or near the banks of the Noroton River. Next below the Jelliffe Company is the plant of the Segal Lock Company, which is located about two hundred feet from a small brook running into the river, and about three hundred feet from the river. Next below, and close to the plant of the defendant, is the British American Manufacturing Company, which is engaged in making rubberized products. This company has two tile waste pipes and three iron pipes and an open ditch connecting with the river. Through these tile pipes there is discharged into the river a benzol solution of rubber, sewage and also an oily waste matter. Below the defendant's plant and above the Phillips Chemical Company, slightly off the stream, is a plant known as "Saunders." This plant uses the water of the stream only for cooling purposes and returns it unchanged.

The products of the plaintiffs are not affected by bacterial waste from sewage, but the presence of copper, iron or zinc in metallic form in sufficient amounts, and of any of these metals in solution in very much smaller amounts, changes the color of the products and affects their purity and marketability. The use of water containing metallic copper in varying quantities would be impracticable. The presence of iron has a worse effect than copper and the presence of zinc is equally injurious.

At the time this action was begun in 1917, the defendant was using water from the river for various purposes and was discharging wash water into the Noroton River without filtration or settling. The defendant was then unlawfully polluting the waters of

the river to the injury of the Stamford Extract Manufacturing Company, without knowledge, however, that it was doing this injury. Thereafter the defendant, in the effort to remedy this harm, constructed a sewage disposal plant, and also a waste disposal plant designed to remove all harmful elements from the wash water, and care for the oily waste, and then and since, in constructing and perfecting these plants, has spent $150,000. In June, 1918, the defendant also paid the plaintiffs a substantial sum of money to compensate them for the damage it had caused, and thereafter, and by the agreement of the parties, the question of money damages claimed to have been sustained by the plaintiffs, or either of them, was removed from the case. A separate unit in the disposal plant has been installed for the treatment of the acid (pickle) wash water and other wash waters. In this system the water is treated with caustic soda, the acid is neutralized, the metal is precipitated and reclaimed, and the water goes back to the pickle wash tubs in the mill to be used over again. Not more than ten per cent of the wash water which is originally used to wash the metal finds its way back into the river, and then only after being treated in this unit of the plant, so that it is almost wholly freed from acid and metals. When this system is working properly no metal in solution and no acid ought to get into the river. At times some metallic copper might do so, and possibly very small amounts of metal in solution and acid. The waters of the river are, however, somewhat alkaline, and the acid would be neutralized and the metals in solution would be precipitated before reaching Kleinfelter's Pond; and the metallic copper escaping into the river, when it reached the pond, could not amount to more than eight-tenths (.8) of one part to a million parts.

Prior to January 1st, 1923, there had been at several

times an overflow from this acid neutralization unit which might have carried some metallic copper to the river. In two instances prior to January 1st, 1923, the machinery upon which the system depends has broken down, resulting in an overflow into the river. The defendant has taken precautions to prevent any future trouble of that sort by establishing a duplication of parts and by improvements in the process, and the possibility of an overflow of this acid pickle wash water into the waters of the river is very slight. No effort is made by the defendant to filter such water as overflows from the plant into the river; such filtration could only remove metallic waste which was not in solution, and would not affect metals in solution or acids; and, as the metallic waste not in solution is not discharged in sufficient quantity to be harmful to the plaintiffs, to establish a filtration plant would be of no avail to the plaintiffs. There is nothing more that the defendant can do, in view of the present state of knowledge, to render harmless its effluent, and to impose upon it any further requirements in that regard would necessitate its closing its plant. The efficiency of its sewerage system is dependent upon the care and attention given it by the defendant and upon the maintenance of proper machinery in condition to keep the water uncontaminated, but there is not substantial danger of any failure in that regard.

From the time in 1917 when they ceased to use the waters of the river, and continuing until about the first day of June, 1918, the plaintiffs did not use those waters, but did use water purchased from the Stamford Water Company. About June 1st, 1918, the defendant had completed the installation of a sewage disposal plant, acid treatment plant, and oil waste disposal plant, so that the effluent which was being discharged from the plant into the river had been ren-

dered harmless in its effect upon the waters of the
river as far as their use by the plaintiffs was concerned.
From that time, June, 1918, until the fire which de-
stroyed their plant in February, 1919, the waters
of the river were used by the plaintiffs for all of their
manufacturing purposes. When the plaintiffs again
began operations, on August 16th, 1920, they made
an examination of the water of the river and it then
appeared that it was safe to use for manufacturing
dyewood extracts. From August, 1920, to October,
1921, the plaintiffs' chemist made frequent tests of the
waters of the river, and found during all this time that
the water was suitable for use for all their manufactur-
ing purposes, and during this time the plaintiffs actually
did use this water, and this water alone, for manufactur-
ing purposes. After about a year slight traces of con-
tamination were noticed, and on September 29th, 1921,
samples taken from points along the river proved the
water to be in a dangerous condition for use in extract-
ing dyewoods. About October 1st, 1921, a large
quantity of the company's products was rendered un-
marketable, the hematin made from the logwood extract
settling out badly, and a quantity of the product was
returned.

The company thereupon ceased to use the river water
for the production of hematin and began to buy, and
ever since has bought, water from the Stamford Water
Company to use for that purpose, and also for drinking
purposes, at a yearly expense of about $1,800. This
water is satisfactory for the manufacture of the products
made by the plaintiffs, and they have had no trouble
in obtaining sufficient quantities of it. What caused
this settling out of the hematin was not satisfactorily
shown, but the company attributed the trouble to the
contaminated condition of the waters of the river, and
notified the defendant of it. The defendant is not

causing any substantial contamination of the waters of the river which can work material harm to the plaintiffs or injuriously affect the waters of Kleinfelter's Pond. The use which the defendant is making of the waters of the river is a reasonable one. During the period from October, 1921, to the date of trial, May 10th, 1923, there have been times when the water of the river was fit for use by the Dyewood Company, but at frequent intervals and for considerable times the water of the river when received at the plant of the plaintiffs has been in such a condition that it could not be safely used for making dyes. Under these circumstances, it is not practicable for the plaintiffs to use the river water in manufacturing dyewood extracts. This is due to the discharge into the river of acids and metallic and other wastes by the factories upon its banks, and, if such discharges were eliminated, the waters of the river would be fit for use in manufacture of dyewood extracts. The plaintiffs could adequately protect themselves from any metals in the river water by installing at their plant a filter, in which alum would be used for settling and filtration and which, of the size to meet their present needs, would cost in the neighborhood of $1,000, and the upkeep of which would be a nominal expense.

It thus appears that when the defendant's disposal plants were completed, about June 1st, 1918, the plaintiffs began to use the river water for all their purposes without injury to their product, and continued to use the water until their plant was destroyed by fire in February, 1919. The plaintiffs began operations again on August 16th, 1920, and continued in successful operation with the river water until October, 1921. The river water was then found to be in a dangerous condition for use in extracting dyewoods, and the company thereafter purchased water for such use

from the Stamford Water Company. This water is satisfactory.

So that from June 1st, 1918, when the disposal plants of the defendant were put in operation, until October, 1921, a period of over three years, the water of the river was not polluted by the defendant so as to affect the plaintiffs' product. After October, 1921, the disposal plants of the defendant were operated as during the three years from June 1st, 1918, until October, 1921, and more effectively by the substitution of the use of caustic soda for soda ash in the plant as a better agency for the neutralization of acid and precipitation of metals, and the defendant has at an expense of $30,000 improved in every way the method for rendering harmless the effluent which flows into the river from its disposal plants.

The trial court finds that the defendant is not causing any substantial contamination of the waters of the river which can injuriously affect the waters of Kleinfelter's Pond, and that the use the defendant is making of the waters of the river is a reasonable one. This conclusion from the subordinate facts is the only conclusion that could be legally or logically drawn by the trial court.

It is to be borne in mind in a suit by lower riparian owners, for an injunction against upper riparian owners who are users of the waters of a river, that the rights of the lower owners may be presented in two aspects: (1) as riparian owners purely, and (2) as riparian owners who are using the river water for some special purpose. As the court says, in substance, in *Silver Spring B. & D. Co.* v. *Wanskuck Co.*, 13 R. I. 611, 615, the right of every owner of land bordering on a stream to the use of the water, and to have it pass his land in its natural state and not appreciably polluted by upper riparian owners, is well known,

and the fact that he also owns a mill on the stream does not lessen his rights. That is, a special use of the water from a river does not confine a riparian owner to the protection by suit of that right; he may also protect his general rights as a riparian owner, whether or not he is exercising them.

These plaintiffs own the land on both sides of Noroton River at Kleinfelter's Pond and below it. As such owners they have certain rights at common law which, therefore, they can protect without reference to any beneficial use of the water actually made by them. These general rights are stated as follows by Chancellor Kent in 3 Kent's Commentaries (14th Ed.) side page 439, as quoted by us in *Parker* v. *Griswold*, 17 Conn. 288, 299: "Every proprietor of lands on the banks of a river has naturally an equal right to the use of the water which flows in the stream adjacent to his lands, as it was wont to run . . . , without diminution or alteration. No proprietor has a right to use the water to the prejudice of other proprietors, above or below him, unless he has a prior right to divert it, or a title to some exclusive enjoyment. He has no property in the water itself, but a simple usufruct while it passes along. *Aqua currit et debet currere ut currere solebat* is the language of the law. Though he may use the water while it runs over his land as an incident to the land, he cannot unreasonably detain it, or give it another direction, and he must return it to its ordinary channel when it leaves his estate. Without the consent of the adjoining proprietors [proprietors below] he cannot divert or diminish the quantity of water which would otherwise descend to the proprietors below, nor throw the water back upon the proprietors above, without a grant, or an uninterrupted enjoyment of twenty years, which is evidence of it. . . . The owner [riparian] must so use and apply the water as

to work no material injury or annoyance to his neighbor below him. . . . All that the law requires of the party, by or over whose land a stream passes, is, that he should use the water in a reasonable manner, and so as not to destroy, or render useless, or materially diminish, or affect the application of the water by the proprietors above or below on the stream. . . . But this rule must not be construed literally, for that would be to deny all valuable use of the water to the [upper] riparian proprietors."

The rights of a riparian owner to the customary flow of a stream, both as to quantity and quality, may be affected by rights acquired by prescription. It is an important concomitant of this fact, that apart from any actual use of the waters of a stream by the lower riparian owner, he is deemed to be injured as to such rights by the use of the water by an upper proprietor which unreasonably diminishes it or unreasonably pollutes it. 3 Kent's Commentaries (14th Ed.) side page 441; *Ingraham* v. *Hutchinson*, 2 Conn. 584, 590; *Buddington* v. *Bradley*, 10 Conn. 213, 218; 2 Farnham on Waters, pp. 1706, 1717, 1735; *Parker* v. *Griswold*, 17 Conn. 288, 302; *Strobel* v. *Kerr Salt Co.*, 164 N. Y. 303, 58 N. E. 142; *Warren* v. *Parkhurst*, 186 N. Y. 45, 78 N. E. 579; *Parker* v. *American Woolen Co.*, 195 Mass. 591, 81 N. E. 468.

The finding discloses that the use of the water of the river for drinking and domestic purposes was discontinued by the plaintiffs and their tenants before the defendant purchased their plant because of contamination by bacteria from sewage, and that such use is not now possible. This is the familiar result of increased population and as was said in *Parker* v. *American Woolen Co.*, *supra:* "Surface drainage into the stream will become more and more injurious to the condition of the water [of a river] as population along its banks grows

denser. No one has the right to complain of injury to the quality of the water coming from any of these causes." The plaintiffs are not seeking to protect the right to have potable water flow to their plant as formerly; they are seeking to have the waters of the river flow free from pollution caused materially in whole or in part by the defendant. The defendant claims that by the operation of its disposal plants, it is not now materially and injuriously polluting the river.

It was the defendant's duty not to discharge any substances into the river that would appreciably pollute it and interfere with any reasonable use by a lower proprietor. *Worthen & Aldrich* v. *White Spring Paper Co.*, 74 N. J. Eq. 647, 70 Atl. 468; *Parker* v. *American Woolen Co., supra.* The trial court has found that the defendant is making only a reasonable use of the waters of the river, and is not causing any substantial contamination of the river, which can injuriously affect the water in Kleinfelter's Pond. We do not find in the record subordinate facts, the reasonable inferences from which disclose that these findings were illegally or illogically made and that a finding of a contrary import should have been made. There was no error in these particulars. In the conclusions made by the court, there are statements of principles of law not related to the essential findings, to which the plaintiffs take exception in their appeal. These we will briefly consider.

The court stated among its conclusions: (101) "That the court may properly consider the relative harm to the parties and others concerned according as it [an injunction] is issued or refused." (102) "So while the fact that the plaintiffs can themselves adopt means to prevent injury could not justify unlawful acts of the defendant, it is proper to be regarded upon the issue of injunctive relief." (103) "Again where several

unite to pollute a stream, no one can defend his own unlawful acts because of the wrongs done by others, and by reason of the difficulty in severing the injury done by each, this very fact may have an important, even controlling, influence in determining as to the issuance of an injunction."

Under the record the court did not have occasion to apply these principles of law or procedure to reach its conclusion that the plaintiffs were not entitled to an injunction. The record discloses that this conclusion was reached because the plaintiffs failed to prove that the defendant was appreciably or materially polluting the river. So that in fact the reasons of appeal relating to these so-called conclusions of the trial court do not raise any material questions of law, and do not justify their present discussion.

The third reason of appeal as to the burden of proof is not sustainable. The case cited falls far short of sustaining the plaintiffs' claim.

There is no error.

In this opinion the other judges concurred.