THE SOUTHERN NEW ENGLAND ICE COMPANY *vs.*
TOWN OF WEST HARTFORD.

MALTBIE, C. J., HAINES, HINMAN, BANKS and AVERY, Js.

Argued November 10th, 1931—decided March 15th, 1932.

*Francis W. Cole* and *Richard H. Deming,* for the appellant (defendant).

*Hugh M. Alcorn* and *David R. Woodhouse,* with whom, on the brief, was *Harold E. Mitchell,* for the appellee (plaintiff).

MALTBIE, C. J.   The complaint alleges that, by reason of pollution occasioned by an overflow sewer which formed a part of the defendant's sewer system, the plaintiff has been deprived of the use of a natural ice pond, the ice upon which it claimed the right to harvest for sale in its business as an ice dealer. The trial was long and the trial court has made a lengthy and careful finding of facts. This finding the defendant seeks to have corrected in many respects. Any attempt to rehearse the facts found or to deal with the claims for correction in detail would unduly prolong this opinion. We shall only refer to such facts as are necessary to present the questions of law involved. As concerns the claims for corrections in the finding, they have all been examined and we find no material respect in which they can be granted. Many of the essential facts were matters of inference to be drawn from a consideration and weighing of numerous circumstances and the conclusions reached by the trial court must stand unless it could not reasonably draw them, which does not appear.

In 1913 or 1914 the defendant constructed a sewer system which included two sewers, one running easterly and the other westerly in Asylum Avenue and both connecting with a trunk line sewer at a point in that Avenue just westerly of a bridge over a small stream which, after joining with another, flowed into the pond in question. At the same time an overflow sanitary sewer was constructed which led from the point where the three sewers joined to a concrete box or basin located at the edge of the stream. This box or basin contained a check valve and discharge which was some twelve inches below the surface of the water in normal weather and through which raw sanitary sewage from the overflow sewer would discharge directly into the stream. This box was less than a mile

and a half above the dam at the southerly end of the plaintiff's pond. The load upon the sewer system steadily increased and the overflow sewer began to function and to discharge raw sanitary sewage, including fecal matter, into the stream and thence into the pond. Prior to January, 1928, the overflow sewer had been in operation but there was no direct evidence as to the time when or the extent to which it operated. In that month, by reason of its operation, large quantities of raw sewage including fecal matter were discharged into the stream and carried thence onto ice which had already formed, though not to a sufficient thickness to cut, upon the plaintiff's pond, with the result that the ice was rendered unfit for human consumption and it was cut and floated over the dam of the pond. On subsequent occasions, the overflow operated and discharged sewage into the stream and in January, 1929, ice on the pond was again rendered unfit for use and was floated over the dam.

Any functioning of the overflow sewer previous to 1928, if it existed, was without the knowledge of the plaintiff or its predecessors in title. Nor does it appear that it was so open and notorious as to fairly apprise the plaintiff of the use being made of the stream and give it an opportunity to assert its rights; and the plaintiff was under no duty to seek out possible sources of pollution of such a nature. *Exley* v. *Gallivan,* 96 Conn. 676, 679, 115 Atl. 482; *Ricci* v. *Naples,* 108 Conn. 19, 25, 142 Atl. 452. Knowledge by the plaintiff's predecessor in title of the construction of the main line of sewer along the stream and pond and consent to that construction could not charge it with knowledge of the existence of the overflow sewer and the use of the stream for the disposal of sewage coming through it. The facts are not such that prior to 1928 the plaintiff had or is chargeable with such notice

of the pollution of the pond or its source as would have afforded a basis for action to secure legal redress against the defendant and hence no adverse user could have originated before that time. *American Brass Co. v. Serra,* 104 Conn. 139, 151, 132 Atl. 565. Even if in any event the defendant could have acquired by prescription the right to use the stream and pond for carrying away sewage, the facts we have stated afford no basis for such a claim.

The defendant claims that the plaintiff had no legal right to cut ice upon the pond. The plaintiff's title comes to it through a conveyance made in 1879 to Edwin H. Arnold of a tract of land in the defendant town abutting upon Farmington Avenue upon the south, which included the buildings upon the land, a mill dam, a mill site and right of flowage. There was upon the land a mill which had been in existence for a great many years, utilizing the dam referred to in the deed, which formed the pond involved in this action. In the same year of his purchase, Arnold erected an ice house upon the property with a capacity of about two hundred tons and began to harvest ice from the pond. Thereafter he cut ice upon it every year when sufficient ice formed. He bought additional land adjoining that owned by him and abutting upon the pond. In 1894 he conveyed a half interest in the land to his son Frederick W. Arnold and thereafter until 1900 they owned the land in common and continued to cut ice upon the pond. In that year the Arnolds conveyed the land, with all the rights of flowage belonging to them and connected with the premises, to The Trout Brook Ice and Feed Company, a corporation organized and controlled by them, and this corporation owned the premises and continued to harvest ice upon the pond until 1927. In that year the land described in the complaint was conveyed by it to

the plaintiff. Beginning with two hundred tons harvested in 1879, ice was continually cut by Edwin H. Arnold and his successors in title over all and any parts of the pond southerly of the northerly boundary of the land conveyed to the plaintiff; additional ice houses were erected from time to time and by 1927 as much as ninety-two hundred tons of ice were being harvested and stored upon the premises each year. The facts found abundantly establish that by that date a prescriptive right to harvest ice upon that portion of the pond conveyed to the plaintiff had been established and was then owned by The Trout Brook Ice and Feed Company. This right was clearly one not in gross but appurtenant to the land abutting upon the pond upon which the ice houses stood. *Graham* v. *Walker*, 78 Conn. 130, 135, 61 Atl. 98; *Whittelsey* v. *Porter*, 82 Conn. 95, 72 Atl. 593.

The southern boundary of the land conveyed by The Trout Brook Ice and Feed Company to the plaintiff, upon which the ice houses stood, was one hundred and forty feet north of and parallel to Farmington Avenue and the land was so described as to include a portion of the pond. This deed expressly included all rights of flowage the grantor had except as to a small area reserved to the grantor, all buildings on the premises, with all tools, equipment and machinery for harvesting and storing ice; it reserved to the grantor the right to take water from the pond for the use of any buildings on certain adjacent property provided the taking of the water would not interfere with the ice-harvesting rights of the grantee, and the habendum clause was in the form usual in warranty deeds, "To have and to hold the above granted and bargained premises with the appurtenances thereof." This deed did not convey the former mill site or the dam connected with it. Reading it as a whole, however, and

particularly when the circumstances surrounding its execution are considered, there cannot be any question of the intent of the parties to convey to the plaintiff the right to harvest ice upon the pond; and, that being so, the language of the deed was sufficient to accomplish that purpose. *Whittelsey* v. *Porter,* 82 Conn. 95, 72 Atl. 593; *Marshall* v. *Martin,* 107 Conn. 32, 35, 139 Atl. 348. The mill had been abandoned not later than 1905, but thereafter every summer and fall the water was drawn off, the land under the pond cleaned and then the pond was permitted to refill. For more than twenty years, therefore, prior to the conveyance to the plaintiff, the right to flow the land had been exercised, not as an incident to the mill, but as a necessary means to harvest the ice upon the pond. A prescriptive right of flowage for that purpose was established as appurtenant to the land upon which the ice houses stood. This right was not dependent upon the continuance of the mill and the fact that the conveyance to the plaintiff did not include the mill site did not work such a severance of the flowage rights appurtenant to the mill as to make the deed to the plaintiff ineffective to convey those rights as appurtenant to the land deeded. That the deed to the plaintiff did not convey all the tract which had previously been used in connection with the ice business did not make ineffectual the grant of a right to harvest ice as appurtenant to the land actually granted. *Alling Realty Co.* v. *Olderman,* 90 Conn. 241, 251, 96 Atl. 944; *Phoenix National Bank* v. *United States Security Trust Co.,* 100 Conn. 622, 623, 124 Atl. 540. The plaintiff was vested with the right to harvest ice upon any and all parts of the pond south of the line which marked the northerly extent of the area which had been used by its predecessors in title for that purpose.

The deed to the plaintiff conveyed to it not merely

the land on the bank of the pond, but also certain land under it extending beyond the bed of the stream in its natural course. The plaintiff was therefore a riparian proprietor and as against it the defendant had no right to discharge any substance into the stream above the pond which would appreciably or materially pollute the waters of the pond or interfere with any reasonable use the plaintiff saw fit to make of it. *Stamford Extract Mfg. Co.* v. *Stamford Rolling Mills Co.,* 101 Conn. 310, 322, 125 Atl. 623; *Donnelly Brick Co., Inc.,* v. *New Britain,* 106 Conn. 167, 173, 137 Atl. 745. It is no defense that the defendant was a municipal corporation and the pollution was the result of its efforts to dispose of the sewage from the dwellings and other buildings of its inhabitants. *Donnelly Brick Co., Inc.* v. *New Britain, supra; Nolan* v. *New Britain,* 69 Conn. 668, 678, 38 Atl. 703. The defendant in the construction of its sewer system intentionally created a situation which would naturally bring about a nuisance, resulting in direct injury to the property rights of the plaintiff and municipal immunity does not protect it from liability for damage so caused. *Nolan* v. *New Britain, supra,* p. 678; *Hoffman* v. *Bristol,* 113 Conn. 386, 389, 155 Atl. 499; *Spitzer* v. *Waterbury,* 113 Conn. 84, 89, 154 Atl. 157. Conceding that the construction of the overflow sewer was in accordance with the principles of good engineering, this would not exempt the defendant from liability. Municipal corporations are granted broad powers of eminent domain and, if, in the construction of their sewers, it becomes necessary to utilize the waters of a stream they can secure the right to do so by condemnation proceedings, involving payment to those whose property rights will be thereby invaded. *Platt Bros. & Co.* v. *Waterbury,* 72 Conn. 531, 551, 45 Atl. 154. To restrict them to that right accords with the

doctrine exemplified in so many ways in modern juris-
prudence that loss to the individual should be made
good by spreading its burden over the many where this
can be done without injustice or undue hardship. If
the town did not see fit to proceed by condemnation
to acquire the right to utilize the stream for its sew-
age, it must expect to answer in damages for any in-
vasion of the rights of others in its waters. The right
of the plaintiff to recover for injury due to the acts of
the defendant includes any damages suffered by it by
reason of the pollution of the ice which it had a right
to harvest from the pond. *Lawton* v. *Herrick*, 83
Conn. 417, 76 Atl. 986.

The trial court reached a conclusion that the plain-
tiff was entitled to damages upon the basis of the
destruction of its ice-cutting privilege. It found that
the operation of the overflow sewer totally and per-
manently destroyed the pond as an ice supply. The
defendant claims that, upon the facts found, with such
corrections in them as it contends should be made,
this conclusion cannot be sustained. That the pond
was totally destroyed as an ice supply so long as the
overflow sewer existed as a part of the sewer system
of the defendant, is not only supported by direct tes-
timony but by reasonable inferences that might be
drawn from the facts proven. That this was due to
the overflow sewer also finds support in direct testi-
mony and in such inferences. The inferences which
the defendant seeks to draw from some of the subordi-
nate facts proven are not sufficient to make the con-
clusions of the trial court improper or unreasonable.
The fact that the water in the streams tributary to
the pond was somewhat polluted loses significance in
view of the fact that all but a very small proportion
of harmful bacteria are eliminated in the process of
freezing and the storing of the ice is also destructive

of them and the further fact that a sample of the ice harvested in 1928 was tested by the state department of health and found safe and satisfactory for domestic use. Moreover, it appears that the danger from using the pond as an ice supply resulted, not from the pollution of the water in the pond, but from the likelihood that, after a sheet of ice had formed, sewage and fecal matter would be flooded upon it, frozen into it, and the fecal matter would tend to keep the bacteria alive even during the storage of the ice.

Whether or not the destruction of the ice-cutting privilege created a permanent condition necessarily required a departure from the field of certainty and involved a weighing of future probabilities. If the trial court reached a reasonable conclusion that such a result was reasonably probable it was entitled to deal with it as an established fact. *Johnson* v. *Connecticut Co.*, 85 Conn. 438, 440, 83 Atl. 530. The sewer overflow was a part of the sewer system as originally constructed and maintained down to the time this controversy arose, nor is there the least suggestion in the record of a plan to abandon it. The volume of sewage in the sewer to which it furnished an outlet was increased by storm water in part from drains which landowners had no right to connect with it and which were ordered discontinued when discovered and in part from infiltration not only such as ordinarily occurs in such sewers but also through broken tiles and pipe joints in which, when originally laid, poor materials had been used, but which had been repaired when discovered; but no doubt this element in the situation the trial court properly considered. On the other hand, the main sewer, running from the point where the overflow sewer started, was insufficient in capacity to conduct away the sewage which might come from the sewers joining it at that point, the flow of sanitary

sewage in which was almost certain to increase as more houses were built in the area served by them. Any likelihood of such changes in the main line of the sewer as would make it adequate to care for all the contents of the sewers entering at the point where the overflow sewer started, might well have been regarded by the trial court as too speculative to deserve serious attention. Particularly is this so, because the outlet of the trunk sewer was into a sewer of restricted size constructed by and running through the city of Hartford, the right to enter which was acquired by a contract which fixed the size of the defendant's sewers which might be opened into it. These and other circumstances make it manifest that the trial court could reasonably reach the conclusion that the situation as found to exist would in all reasonable probability be a permanent condition.

Upon the basis of this finding, the trial court awarded the plaintiff damages based upon the destruction of the value of its land for use in its business as an ice dealer. We have never had occasion to consider the nature and scope of a cause of action based upon the creation of a permanent nuisance to the injury of another. In previous cases before us, damages have been sought for an interference with the lawful use of the plaintiff's property prior to the bringing of the action and a permanent taking of any interest in it has not been claimed. *Nolan* v. *New Britain*, 69 Conn. 668, 38 Atl. 703; *Platt Bros. & Co.* v. *Waterbury*, 72 Conn. 531, 45 Atl. 154; *Platt Bros. & Co.* v. *Waterbury*, 80 Conn. 179, 67 Atl. 508; *Cables* v. *Bristol Water Co.*, 86 Conn. 223, 84 Atl. 928; *Donnelly Brick Co., Inc.* v. *New Britain*, 106 Conn. 167, 137 Atl. 745. It has been very generally held that where one builds or maintains upon his land a structure which creates a permanent nuisance upon the lands

of another to his injury, not because of any negligence in the construction or maintenance of the structure, the latter is entitled to recover once for all damages for the injury, measured by the resulting depreciation in the value of the property. 20 R. C. L. p. 465; 46 Corpus Juris, 826, 827; 4 Sutherland, Damages (4th Ed.) p. 3853; and especially see collection and analysis of cases in note, L. R. A., 1916E, p. 997. In allowing damages upon this basis, courts have undoubtedly adopted various theories by no means reconcilable. The rule in cases to which it is rightly applicable is sound in policy and is likely to accomplish more justice than is the requirement that damages be sought in a series of recurring suits for interference with the use of property prior to the institution of the action. *Interest reipublicæ ut sit finis litium.* Parties, by having their rights determined once for all, will be enabled to decide upon their future conduct and be relieved of the burden of a long course of litigation; and the rule of damages will be much more easily and accurately applied than if attempts were made to estimate them from time to time, particularly as the years pass. The latter consideration is well exemplified in the present case, where the rule of damages in recurring suits would be largely based upon the loss of profits which the plaintiff might otherwise have received from its ice business; *Lawton* v. *Herrick,* 83 Conn. 417, 422, 76 Atl. 986; and certainly, as time went by, any fair estimate of damages upon such a basis would be increasingly difficult. The difficulty arises in determining when a nuisance is of such a nature that the rule ought to be applied. Several attempts have been made to formulate a rule or test of general application, but each leaves something to be desired. We shall not seek to formulate any such rule or test, but

will rest our decision upon the facts of the particular case before us.

Any presumption that a nuisance of such a nature as the one involved in this case is temporary and not permanent, we regard at most as one of fact, depending upon the natural probabilities that one will not continue in a course of conduct which is unlawful and for which he will be held liable in substantial damages to another, and it must yield to a finding that in fact the nuisance is permanent in its nature. *Danielly* v. *Cheeves,* 94 Ga. 263, 269, 21 S. E. 524. In the instant case, there is no reasonable probability of any change in the structure of the sewer overflow in the future or that it will cease to operate upon occasion. There is no negligence in its construction or maintenance, but the court has found and the defendant acquiesces in the finding that its construction and maintenance represent good engineering practice. While it is designed to, and probably will, operate only intermittently, the damage to the right of the defendant to cut ice upon its pond is permanent, for the mere possibility of its operation is sufficient entirely to destroy the marketability of any ice harvested, no matter how pure and uncontaminated a particular crop may be. By its charter, the defendant had a right to construct the sewer in its streets and to build the overflow sewer and tank, which stand within the limits of the highway; 15 Special Laws, p. 163; 16 Special Laws, p. 690; and this right would prevail over the provisions of the general statute permitting the officers of a company having the right to harvest ice to abate in certain instances any nuisance likely to pollute it, even if the statute was applicable, which we do not decide. General Statutes, § 2539; *State ex rel. Wallen* v. *Hatch,* 82 Conn. 122, 124, 72 Atl. 575. Nor is it at all certain, in view of the interference with the sewage

of a populous portion of the defendant town which would result, that an injunction against the pollution of the stream by the sewer overflow could be secured. *New Haven Water Co.* v. *Wallingford,* 72 Conn. 293, 304, 44 Atl. 235; *Mitchell* v. *Southern New England Telephone Co.,* 90 Conn. 179, 183, 96 Atl. 966. We cannot therefore regard the nuisance in the instant case as one abatable at the instance of or by the plaintiff. That, aside from the sewer, there might arise in the future other sources of pollution which would render it impossible longer to use the pond for an ice supply, is wholly problematical and perhaps finds its best answer in the value of the right to harvest ice upon it as found by the court and testified to by competent witnesses. The trial court under these circumstances was correct in its conclusion that the plaintiff was entitled to recover damages for the permanent destruction of its right to cut ice from the pond and that these damages should be measured by the depreciation in value of its property resulting therefrom.

The evidence amply supports the amount of damages awarded. Even if, as the defendant claims, that award exceeds the amount paid by the plaintiff for the property when it was purchased in 1927, this would not invalidate the award. The measure of damages is the depreciation in the actual value of the property and the amount paid for it does not necessarily establish that value. *Vollaro* v. *Gargano,* 97 Conn. 275, 278, 116 Atl. 179. The damages were based upon the destruction of the ice-cutting privilege. The fact that after that was destroyed the plaintiff continued in possession of the land for the storage of ice cut the previous winter, cannot affect the plaintiff's right to damages awarded upon that basis.

The overflow sewer began to operate some time prior to 1928. That year and the next, one sheet of

ice which had formed upon the pond was found to be so polluted that it was sent over the dam, but in each year some ice was harvested from the pond and sold. On August 15th, 1929, as a result of an investigation made by a representative of the state department of health, the state commissioner of health wrote to the plaintiff a letter in which he called attention to § 2538 of the General Statutes, Revision of 1918 (§ 2537, Revision of 1930), which forbids, under a penalty, the sale of ice from certain ponds, streams and rivers into which any sewer discharges, and in which he stated that it appeared that the ice supply at the pond must be abandoned. The plaintiff thereupon began plans for the construction of an artificial ice plant upon the property and, not succeeding in obtaining the necessary change in the zoning regulations of the defendant town, in the winter of 1929 it began the construction of such a plant at another location. The trial court fixed as the date when the destruction of the plaintiff's right to cut ice became complete that of the receipt of the letter from the commissioner of health. To justify that conclusion it is not necessary to regard the letter as a legally effective order forbidding thereafter the sale of ice from the pond. The destruction of the plaintiff's right to cut and market ice from it resulted from the conditions which the defendant had created. The plaintiff was not bound to await formal action by the health authorities, but under the circumstances it was its duty not to attempt to market any ice thereafter cut from the pond. The significance of the letter did not lie in its effectiveness as an order, nor was it evidence of the truth of any fact it stated. But the trial court might reasonably regard it as the circumstance which brought the matter to a head and as marking the time when the plaintiff finally gave up any purpose of har-

vesting ice from the pond and when its right to do so was completely destroyed. We cannot find error in the conclusion of the trial court that the plaintiff's cause of action became complete upon the receipt of the letter.

The plaintiff's conduct thereafter in tearing down its ice houses, useless to it, was within its rights and was not such an abandonment of its business as would impair or destroy its present cause of action. That cause of action did not arise when the overflow sewer was constructed, but only when the plaintiff's property right to harvest ice from the pond was destroyed. This did not occur until August, 1929, and consequently the plaintiff was not debarred of its action brought in September, 1929, either by the statutes of limitation or by laches. *Platt Bros. & Co.* v. *Waterbury,* 80 Conn. 179, 183, 67 Atl. 508; *Feudl* v. *New Britain,* 88 Conn. 125, 129, 90 Atl. 35.

The trial court did not err in allowing the plaintiff to recover interest. "Interest upon a demand which is unpaid when due is ordinarily not given as interest *eo nomine,* but as damages for the detention of the money, which, for the sake of convenience, are measured by interest upon the sum due." *Blake* v. *Waterbury,* 105 Conn. 482, 486, 136 Atl. 95. When, by the acts of the defendant, the right of the plaintiff to cut ice on the pond was destroyed, the plaintiff became entitled to receive in money the equivalent in value of that right and thereafter the money was wrongfully withheld from it. That the amount of damages was unliquidated is not a sufficient reason in a case such as this to withhold an allowance of interest. *Parrott* v. *Housatonic R. Co.,* 47 Conn. 575, 576; *Regan* v. *New York & N. E. R. Co.,* 60 Conn. 124, 142, 22 Atl. 503. The trial court did, however, by a clerical error, calculate the period for which interest

was recoverable as beginning on August 5th, 1929, instead of August 15th, 1929, and to this extent there is error in the judgment.

The trial of this case took twelve days and the defendant brings up for review only two rulings on evidence. One was the ruling of the trial court admitting in evidence the letter from the state commissioner of health, before referred to. This was admitted not as evidence of the truth of any statements contained in it and its admissibility and proper place in the case we have already discussed. The other error claimed was the exclusion of a certified copy of the record of a meeting of the board of health commissioners of Hartford, held in 1905. The only possible relevance of the record was a brief account in it of a report of a bacteriologist as to the results of an examination of the waters of the pond at that time. This evidence, as the trial court suggested in its ruling, was extremely remote, and even if it did not make that the basis of its exclusion the evidence would be too immaterial in view of the other evidence in the case to make the exclusion harmful.

As the only error is in the calculation of interest and the printing of the evidence was in support of claims of error as to the finding not established in any material particular, the cost of printing it should not be taxed to the defendant. Rules for Appellate Procedure, § 10.

There is error only in the amount of interest allowed in the judgment, the judgment is set aside and the trial court directed to enter judgment for the plaintiff to recover $80,000 with interest from August 15th, 1929. The defendant is not to recover any costs for printing the evidence upon the appeal.

In this opinion the other judges concurred.