## IL GIARDINO, LLC *v.* THE BELLE HAVEN LAND COMPANY ET AL.
### (SC 16267)

Borden, Norcott, Katz, Sullivan and Vertefeuille, Js.

Argued June 2—officially released September 5, 2000

*Andrew P. Nemiroff,* with whom was *Eric R. Posmantier,* for the appellants (defendants).

*Richard E. Castiglioni*, with whom, on the brief, was *Craig P. Nowak*, for the appellee (plaintiff).

*Opinion*

BORDEN, J. The defendants, the Belle Haven Land Company and David F. Ogilvy,[1] appeal[2] from the judgment of the trial court rendered after a court trial, granting a permanent injunction in favor of the plaintiff, Il Giardino, LLC. The defendants claim that the trial court improperly concluded that: (1) the plaintiff holds an express easement over the roads of the Belle Haven Land Company; (2) alternatively, the plaintiff holds an implied easement over such roads; and (3) under *Whitton* v. *Clark*, 112 Conn. 28, 32, 151 A. 305 (1930), a predecessor in title of Ogilvy had the right to convey his interest in such roads to a predecessor in title of the plaintiff. We agree with the defendants and, accordingly, we reverse the judgment of the trial court.

The record reveals the following undisputed facts. All of the parcels of real property involved in the present case are located in the private communities of Belle Haven and Field Point within the town of Greenwich (town). They were developed respectively by the Belle Haven Land Company and the Field Point Land Company, which is currently the Field Point Park Association, Inc.[3] The plaintiff is the owner of a parcel of property located in Field Point. On the easterly side of

---

[1] Thomas P. Clephane was also a defendant in the underlying action. A default judgment was rendered against him, however, and that judgment is not before us in this appeal. References throughout this opinion to the defendants are to the Belle Haven Land Company and Ogilvy.

[2] The defendants appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

[3] The Belle Haven Land Company is a specially chartered corporation incorporated in 1884 by Special Act No. 13 of the state legislature. 9 Spec. Acts 894, No. 13 (1884). The Field Point Land Company is also a specially chartered corporation, which was incorporated in 1889 by Special Act No. 323 of the state legislature. 10 Spec. Acts 1148, No. 323 (1889).

the plaintiff's property is Field Point Circle, a private road that the plaintiff has the right to use by virtue of its ownership of Field Point property. Thomas P. Clephane and Ogilvy own separate, adjoining Belle Haven parcels of property, which are contiguous to the plaintiff's property on the westerly side. On the westerly side of Clephane's property and Ogilvy's Belle Haven property[4] is Glenwood Drive, a private road owned by the Belle Haven Land Company. From the plaintiff's property and Ogilvy's Field Point property, running westerly along the property line that divides Clephane's property and Ogilvy's Belle Haven property, is a twenty foot wide right-of-way in favor of the plaintiff's property and Ogilvy's Field Point property, which leads to Glenwood Drive. It is by virtue of this easement that the plaintiff claims it has the right to use the roads of Belle Haven.

The following facts relate to the chains of title to the relevant Belle Haven properties, namely, Clephane's property, Ogilvy's Belle Haven property and Glenwood Drive. In 1884, the Belle Haven Land Company acquired from James R. Mead a parcel of property, which included what are now, among other parcels, Clephane's property, Ogilvy's Belle Haven property and Glenwood Drive. On August 26, 1897, the Belle Haven Land Company conveyed various parcels of that property to Nathaniel Witherell and Robert M. Bruce, as trustees of the company, to sell the parcels for a reasonable value, the proceeds of which were to be distributed among stockholders of the company. One of these parcels was described in the deed as follows: "The third of said parcels of land with the bathing house thereon, is bounded northerly by land now or formerly of The Belle Haven Land Company, easterly by land of Oliver

[1] Because Ogilvy owns property in both Belle Haven and Field Point, we refer to the properties as Ogilvy's Belle Haven property and Ogilvy's Field Point property, respectively.

D. Mead, Southerly by the waters of Long Island Sound and westerly by Glenwood Drive (so called)." The deed also recited that those parcels were conveyed "together with the right to use in common with others to whom such right has been or maybe hereafter granted by said Company, the ways and avenues of said company as the same may be necessary and convenient in passing to and from said premises hereby conveyed . . . ." The deed further provides: "To Have and To Hold, the above granted and bargained premises with the privileges and appurtenances thereof unto them the said grantees, their successors and assigns forever, to their own proper use and behoof. . . . And the several covenants, agreements and provisions herein contained shall run with the land hereby conveyed and be binding upon said grantees, their successors and assigns forever."

On May 18, 1901, Witherell and Bruce conveyed a portion of this "third parcel" to John F. Leahy. The deed describes the parcel as follows: "All that certain lot of land situated at Belle Haven in the said town of Greenwich and bounded and described as follows; Northerly about one hundred and thirty two (132) feet by lot, No. 94 as shown on map entitled 'Map of Belle Haven in the Town of Greenwich, Fairfield County, Connecticut' made by B.S. Olmstead, topographical engineer, on file in the office of the clerk of the Town of Greenwich; easterly two hundred and one (201) feet by land of The Field Point Land Company; southerly one hundred and forty one and three tenths (141.3) feet by land of The Greenwich Casino association and westerly about two hundred and six (206) feet by Glenwood Drive. Together with all the rights and privileges and subject to all the covenants, conditions and provisions in so far as they affect said premises set forth in said deed from said Belle Haven Land Company to said Trustees, recorded in said records book 77 page 240.

To have and to hold the above granted and bargained premises, with the privileges and appurtenances thereof unto him the said grantee his heirs and assigns forever, to his and their own proper use and behoof." That same day, Leahy, serving as a strawman, conveyed that parcel to Witherell, in his individual capacity. The deed of such conveyance generally contained the same language that was quoted from the deed by which Leahy obtained the parcel. Several conveyances of this property, which need not be described herein, subsequently took place. Clephane and Ogilvy currently own separate, contiguous Belle Haven parcels, which were once owned by Witherell. Glenwood Drive is currently and since 1884 has been owned by the Belle Haven Land Company.

Sometime prior to 1901, the Field Point Land Company acquired several parcels of property in Field Point, two of which are referred to as lots 7 and 8, which include what are now the plaintiff's property and Ogilvy's Field Point property, respectively, the plaintiff's property being the northerly parcel.

The following relates to the easement granted in favor of lots 7 and 8. On November 5, 1901, Witherell, in his individual capacity, granted a twenty foot wide easement over the parcel conveyed to him by Leahy in favor of the Field Point Land Company. On November 20, 1901, this right-of-way was recorded. The easement is described in the deed as follows: "[A] right of way for all purposes of travel twenty feet wide from Lots 7 & 8 on a certain map entitled 'Map of Field Point, Greenwich, Conn.' filed or to be filed in the office of the Town Clerk of said Town of Greenwich, across land conveyed to me by John F. Leahy by deed dated May 18, 1901, to the Belle Haven Road, known as Glenwood Drive. Said right of way is over a strip of land twenty feet wide throughout its entire length bounded northerly by Lot No. 94 as shown on a map entitled 'Map of Belle Haven in the Town of Greenwich, Fairfield County,

Connecticut,' made by B.S. Olmstead, topographical engineer, on file in the office of the Town Clerk of said Greenwich, easterly by said lots 7 & 8, southerly by other land of the grantor, and westerly by said Glenwood Drive. Said right of way is to be used by said Field Point Land Company and by all persons, their heirs and assigns, to whom said The Field Point Land Company shall convey any part of the real estate now owned by said Company, together with the right to use said above described right of way. TO HAVE AND TO HOLD the above granted and bargained right of way with the privileges and appurtenances thereof unto the said grantee, its successors and assigns, forever, to its and their own proper use and behoof."

The following facts relate to the plaintiff's chain of title. On December 3, 1901, the Field Point Land Company conveyed lot 7 to Frank L. Froment, one of the plaintiff's predecessors in title. Several conveyances of lot 7, which need not be described herein, subsequently took place. In 1978, a predecessor in title of the plaintiff subdivided lot 7, and, in 1995, the plaintiff acquired the westerly portion thereof, "together with such rights as the grantor may have to use a right of way 20 feet wide from said premises to Glenwood Drive, which said right of way is described in a grant dated November 5, 1901 . . . ."

With respect to Ogilvy's Field Point property, the Field Point Land Company conveyed lot 8 to Frederick Hilliard, Ogilvy's Field Point predecessor in title. Lot 8 subsequently was divided and Ogilvy acquired the westerly portion of lot 8, which we refer to as his Field Point property. Additional facts and procedural history will be provided as necessary.

The plaintiff brought this action against the defendants and Clephane, seeking a declaratory judgment quieting title in the twenty foot right-of-way and the

right to use the Belle Haven roads, and also seeking a permanent injunction to have removed a certain barrier that the Belle Haven Land Company had erected across the egress to Glenwood Drive from the twenty foot right-of-way on Clephane's property and Ogilvy's Belle Haven property. In the first count of an amended two count complaint, the plaintiff alleged that it "has an express and/or implied right to the use and enjoyment of a Right-of-Way across [Clephane's property and Ogilvy's Belle Haven property], and to use the adjoining ways and avenues of the [Belle Haven Land Company], including Glenwood Drive." The plaintiff also alleged that its right to use the twenty foot right-of-way and the Belle Haven roads is established by the Connecticut Marketable Title Act (act). General Statutes § 47-33b et seq. The plaintiff further alleged that the defendants and Clephane "have wilfully denied the Plaintiff the use and enjoyment of the aforementioned express and/or implied Right-of-Way and Grant-of-Use to the ways and avenues of [the Belle Haven Land Company] by . . . (i) erecting a barrier across the egress to said Right-of-Way at the intersection between the same, Glenwood Drive, and the Ogilvy and Clephane parcels located at and known as 55 and 51 Glenwood Drive; and (ii) erecting or posting a 'Road Closed' sign across the egress to said Right-of-Way at the intersection between the same, Glenwood Drive, and the Ogilvy and Clephane parcels located at and known as 55 and 51 Glenwood Drive." The plaintiff also alleged that, by virtue of the described conduct, the defendants and Clephane deprived the plaintiff "of the quiet enjoyment and use of the aforementioned express and/or implied Right-of-Way and Grant-of-Use to the ways and avenues of the [Belle Haven Land Company] and has, thereby, been deprived of a substantial valuable right in, and to, such interests in land and has suffered an impairment of the value of its land because of the erection of the barrier."

Furthermore, such actions, according to the plaintiff, "created a dangerous condition on the [plaintiff's] parcel in that emergency vehicles and personnel do not have a reasonable and expedient access to the rear of said property in the event of medical, or other, emergency." In the second count of the amended complaint, the plaintiff alleged that the actions described in the allegations of count one "were committed maliciously and with the intent to annoy or injure the plaintiff in its use or disposition of the [plaintiff's] parcel," in violation of General Statutes § 52-570.[5]

After a court trial, the court concluded that the plaintiff holds: (1) an express easement over the roads of Belle Haven; (2) alternatively, an easement by implication over such roads; and (3) an easement over such roads by virtue of the reference in a deed to a map of the Belle Haven roads, which, under *Whitton* v. *Clark*, supra, 112 Conn. 32, gave Clephane and Ogilvy's predecessor in title the right to use such roads and the right to transfer such right. Accordingly, the trial court rendered judgment in favor of the plaintiff granting a permanent injunction in favor of the plaintiff, ordering the defendants to remove the barrier and to allow the plaintiff to use the roads of Belle Haven, and prohibiting the defendants from erecting any barrier that may block the plaintiff's twenty foot wide right-of-way. This appeal followed.

The principles governing our construction of conveyance instruments are well established. "In construing a deed, a court must consider the language and terms of the instrument as a whole. . . . Our basic rule of construction is that recognition will be given to the

---

[5] General Statutes § 52-570 provides: "Action for malicious erection of structure. An action may be maintained by the proprietor of any land against the owner or lessee of land adjacent, who maliciously erects any structure thereon, with intent to annoy or injure the plaintiff in his use or disposition of his land."

expressed intention of the parties to a deed or other
conveyance, and that it shall, if possible, be so con-
strued as to effectuate the intent of the parties. . . .
In arriving at the intent expressed . . . in the language
used, however, it is always admissible to consider the
situation of the parties and the circumstances con-
nected with the transaction, and every part of the writ-
ing should be considered with the help of that evidence.
. . . The construction of a deed in order to ascertain
the intent expressed in the deed presents a question
of law and requires consideration of all its relevant
provisions in the light of the surrounding circum-
stances. . . . *Hare* v. *McClellan*, 234 Conn. 581, 593–94,
662 A.2d 1242 (1995). Thus, if the meaning of the lan-
guage contained in a deed or conveyance is not clear,
the trial court is bound to consider any relevant extrin-
sic evidence presented by the parties for the purpose
of clarifying the ambiguity. Id., 594–97. Finally, our
review of the trial court's construction of the instrument
is plenary. Id., 594; *Carbone* v. *Vigliotti*, 222 Conn. 216,
222, 610 A.2d 565 (1992)." (Internal quotation marks
omitted.) *Lakeview Associates* v. *Woodlake Master Con-
dominium Assn., Inc.*, 239 Conn. 769, 780–81, 687 A.2d
1270 (1997).

I

We first consider the defendants' claim that the trial
court improperly concluded that the plaintiff holds an
express easement over the roads of the Belle Haven
Land Company, namely, Glenwood Drive. The defen-
dants do not dispute that the plaintiff possesses an
easement across Clephane's and Ogilvy's Belle Haven
property. They contend, however, that this easement,
created by Witherell in his individual capacity, is limited
to traveling over those properties and does not grant
the right to travel over the roads of Belle Haven. Specifi-
cally, the defendants argue that the plaintiff does not
have the right to use the Belle Haven roads because

Witherell, in his individual capacity, did not have the legal right to grant such use. The defendants also argue that Witherell could not have conveyed the right to use Glenwood Drive because such a conveyance would have overburdened Glenwood Drive, the servient estate. Finally, the defendants argue that the deed granting the twenty foot wide right-of-way over Witherell's property in favor of the Field Point Land Company did not grant the use of the Belle Haven roads. We conclude that Witherell did not have the legal right to grant the use of the Belle Haven roads and, therefore, that the plaintiff does not hold an express easement over such roads.

In order to address this claim, we first set forth the relevant well established principles governing easements. "Easements are classified as either easements appurtenant or easements in gross. . . . Two distinct estates are involved in an easement appurtenant: the dominant to which the easement belongs and the servient upon which the obligation rests. *Deregibus* v. *Silberman Furniture Co.*, 121 Conn. 633, 186 A. 553 (1936). An easement appurtenant must be of benefit to the dominant estate but the servient estate need not be adjacent to the dominant estate. *Phoenix National Bank* v. *United States Security Trust Co.*, 100 Conn. 622, 124 A. 540 (1924); *Graham* v. *Walker*, 78 Conn. 130, 135, 61 A. 98 (1905); 25 Am. Jur. 2d, Easements and Licenses § 11. An easement in gross is one which does not benefit the possessor of any tract of land in his use of it as such possessor. *Hartford National Bank & Trust Co.* v. *Redevelopment Agency*, 164 Conn. 337, 341, 321 A.2d 469 (1973). 'An easement in gross belongs to the owner of it independently of his ownership or possession of any specific land. Therefore, in contrast to an easement appurtenant, its ownership may be described as being personal to the owner of it.' Restatement, 5 Property § 454, comment (a)." (Citation

omitted.) *Saunders Point Assn., Inc.* v. *Cannon*, 177 Conn. 413, 415, 418 A.2d 70 (1979).

The general modern rule regarding the interplay between an easement appurtenant and a nondominant estate is that an "[a]ppurtenant easement cannot be used to serve [a] nondominant estate." 1 Restatement (Third), Property, Servitudes § 4.11, comment (b), p. 620 (2000). This rule is widely held by modern authority[6] and previously has been cited by this court. See, e.g., *Carbone* v. *Vigliotti*, supra, 222 Conn. 225. The purpose undergirding the rule is that the owner of the easement appurtenant may not materially increase the burden of the easement upon the servient estate or impose a new or additional burden. The doctrine was "intended to protect the servient estate from the use of an easement in a manner or to an extent not within the reasonable expectations of the parties at the time of its creation." Id.

We previously have departed from that general rule where the purpose of the rule would not have been served by disallowing the use of an easement appurtenant. Thus, we carved out an exception where the dominant estate was simply being enlarged by the subsequent acquisition of an adjoining parcel by the owner of the dominant estate. In *Carbone* v. *Vigliotti*, supra, 222 Conn. 218, the defendant had purchased a tract of land comprised of four contiguous parcels. The defendant, by virtue of his ownership of one of the parcels, had acquired a right-of-way over the plaintiff's driveway for use in conjunction with that parcel. Id., 224. The defendant sought, however, to have the right-of-way benefit two of the other parcels, to which the easement was not appurtenant. Id. We affirmed the trial court's conclusion that the defendant was entitled to use the right-of-way for the benefit of the three parcels.

---

[6] For examples, see 1 Restatement (Third), supra, § 4.11, pp. 623–25.

Id., 225. We reasoned that the proposed use of the right-of-way was not "materially different" from that contemplated when the dominant estate was conveyed with an easement appurtenant. Id., 224; see also id., 225 (distinguishing *Lichteig* v. *Churinetz*, 9 Conn. App. 406, 409, 411–12, 519 A.2d 99 [1986], in which defendant owner of dominant estate was enjoined from using easement appurtenant to such estate on which his residence was situated, for purpose of providing access to house on other land that he owned, because there had been material increase in vehicular traffic on easement resulting from its use by occupants of house on nondominant estate owned by defendant).

Rejecting a bright-line rule to the contrary, we concluded that, "when no significant change has occurred in the use of the easement from that contemplated when it was created, as in this case, the mere addition of other land to the dominant estate does not constitute an overburden or misuse of the easement." *Carbone* v. *Vigliotti*, supra, 222 Conn. 225; see also *Ogle* v. *Trotter*, 495 S.W.2d 558, 566 (Tenn. App. 1973) (where extension of use of easement materially decreased burden on servient estate, owners of dominant estate not enjoined from using easement to benefit their contiguous nondominant estate); *Brown* v. *Voss*, 105 Wash. 2d 366, 370, 373, 715 P.2d 514 (1986) (where no evidence of any increase in burden on servient estate, trial court did not abuse its discretion in denying request to enjoin owner of dominant estate from using easement to benefit contiguous nondominant estate owned by same owner).

Subsequently, in *Abington Ltd. Partnership* v. *Heublein*, 246 Conn. 815, 829, 717 A.2d 1232 (1998), we reaffirmed our holding in *Carbone*, noting that it "reflects the present day understanding of the law of easements and servitudes contained in the Restatement (Third) of Property, Servitudes."

The fundamental distinction between those cases and the present case is that in the former, the user of the appurtenant easement was also the owner of the dominant estate. That is not the case here. The distinction is a meaningful one because it would be contrary to common sense to disallow, in some cases, the use of the easement for the benefit of a nondominant estate owned by the dominant estate owner, but allow the use of the easement for the benefit of a nondominant estate owned by a nonowner of the dominant estate. Stated another way, it would be incongruous to allow the expansion of the use of an easement, appurtenant to the dominant estate, to benefit a party who does not hold a possessory interest in the dominant estate, but disallow the expansion of the use of the easement to benefit a nondominant estate that subsequently was acquired by the dominant estate owner.

Similarly, as a general rule, "an appurtenant benefit may not be severed and transferred separately from all or part of the benefited property." 2 Restatement (Third), supra, § 5.6, p. 46. The purpose of this rule mirrors that of the rule against the use of the easement to benefit a nondominant estate. "Limiting use of an appurtenant easement or profit to holders of the dominant estate . . . limits the potential burden on the servient estate. . . . Permitting severance and separate transfer of the benefit would generally permit conversion of an appurtenant benefit into a benefit in gross, imposing a greater burden on the property. . . . The rule reflects a presumption as to the likely intent of the parties who created the servitude rather than a public policy against conversion of appurtenant benefits into benefits in gross."[7] Id., § 5.6, comment (a), p. 47.

---

[7] The following illustration set forth by the Restatement (Third) offers an example of this rule's application: "There is an easement appurtenant to Blackacre for use of Whiteacre for recreational purposes. O, the owner of Blackacre, transferred the benefit of the easement to D, the owner and developer of a large adjacent tract. In the absence of other facts or circumstances, the conclusion would be justified that O's attempted severance is

In *Carbone* v. *Vigliotti*, supra, 222 Conn. 225, and *Abington Ltd. Partnership* v. *Heublein*, supra, 246 Conn. 829, we were willing to allow the extended use of the easement appurtenant to the dominant estate under circumstances where there had been a so-called expansion of the dominant estate, by virtue of the subsequent acquisition of a nondominant estate by the owner of the dominant estate, and where the extended use of the easement to the benefit of the nondominant estate would not result in a material increase in the use of the servient estate, in other words, an additional burden to the servient estate. We conclude, however, that the expanded use of an easement appurtenant by the dominant estate to benefit a nondominant estate, not owned by the dominant estate owner, constitutes, as a matter of law, an impermissible overburdening of the servient estate. The owner of the dominant estate, holder of the benefit of the easement appurtenant to its estate, may not, as a matter of law, transfer its rights under the easement in the absence of a conveyance of the fee in the dominant estate.

The dispositive question relating to this claim on appeal is whether Witherell, in his individual capacity, had the legal right to transfer or grant his right to travel over the roads of the Belle Haven Land Company, namely, Glenwood Drive, to the plaintiff's predecessor in title. If Witherell had no legal right to make such a transfer, then the particular language of the conveyance is immaterial.

As a threshold matter, we first address how Witherell obtained his right to travel over the ways and avenues of the Belle Haven Land Company. As stated previously, the deed by which Leahy conveyed the parcel to Witherell states that the parcel was conveyed "[t]ogether with

ineffective, but did not destroy the easement." 2 Restatement (Third), supra, § 5.6, comment (a), illustration (1), p. 48.

all the rights and privileges and subject to all the Covenants, conditions and provisions in so far as they affect said premises set forth in a certain deed from The Belle Haven Land Company to Robert M. Bruce and Nathaniel Witherell, as trustees, dated, August 26, 1897 and recorded in the Greenwich Land Records book 77 page 240." The deed to which this language refers conveyed the various parcels from the Belle Haven Land Company to Witherell and Bruce, as trustees, "together with *the right to use* in common with others to whom such right has been or maybe hereafter granted by said Company, *the ways and avenues of said company* as the same may be necessary and convenient in *passing to and from said premises hereby conveyed* . . . ." (Emphasis added.) The deed from Witherell and Bruce, as trustees, to Leahy contained rights and privileges language nearly identical to that which was just quoted.

Witherell's right to use the roads of Belle Haven was therefore created by express grant. Accordingly, guided by the principles described previously, we must determine the extent of the right acquired from the terms of the grant, which are construed so as to give effect to the intention of the parties. By the express terms of the grant, Witherell acquired a private road easement across the Belle Haven roads and the right to use the easement for ingress to and egress from those properties. It is undisputed that Witherell's right to use the Belle Haven Land Company's roads was an easement appurtenant to his property, which was the dominant estate in relation to that right. Witherell, and subsequently, Clephane and Ogilvy, therefore, as owners of the dominant estates, acquired rights in the use of the easement over the roads of Belle Haven for ingress to and egress from their Belle Haven properties. The plaintiff, however, has no such easement rights with respect to the Belle Haven roads, in connection with

its ownership of its parcel, which was not a part of the original dominant estate under the terms of the grant.

The question then becomes whether Witherell had the legal right to transfer that right. On the basis of the well established principles articulated previously, we conclude that Witherell did not have the legal right to transfer his right to use the Belle Haven roads absent a conveyance of his property to which the easement was appurtenant. Accordingly, we conclude that the plaintiff does not hold an express easement over the roads of the Belle Haven Land Company, specifically, Glenwood Drive.

The plaintiff correctly points out that, in *Carbone* v. *Vigliotti*, supra, 222 Conn. 225, we made a factual inquiry into whether the expansion of the easement for the use of subsequently acquired property, which served to enlarge the dominant estate, constituted an overburdening or misuse of the easement. The plaintiff argues that the Belle Haven Land Company failed to demonstrate that the plaintiff's use of the roads of Belle Haven would constitute an overburdening of its roads.[8] No factual inquiry into the proposed use by the plaintiff of the Belle Haven roads was necessary, however, because, as we concluded previously, the extension of the use of an easement by the dominant estate for the benefit of a nondominant estate, where the nondominant estate is owned by a different owner, constitutes, as a matter of law, an overburdening of the servient estate.

Similarly, the plaintiff contends, Ogilvy "has attached the right to use the roads of Belle Haven to his property

---

[8] In that connection, the plaintiff argues that none of the officers or directors of the Belle Haven Land Company testified at trial that the roads of Belle Haven would be overburdened by the plaintiff's use. The plaintiff also asserts that the 315 members of the Belle Haven Club as well as their guests use the roads.

located in" Field Point. According to the plaintiff, because the Belle Haven Land Company has not objected to Ogilvy's use of the roads for the benefit of his Field Point property, the Belle Haven Land Company may not complain that the plaintiff's use of the roads constitutes an overburdening. This argument, however, ignores the analysis described previously that would apply to such a claim against Ogilvy, namely, the analysis undertaken in *Carbone* v. *Vigliotti*, supra, 222 Conn. 216—an analysis that, for the reasons stated herein, is inapplicable to the present case. As stated previously, our rejection of a bright-line rule that would per se prohibit the use of an appurtenant easement to serve a nondominant estate was not so expansive as to permit the use of an easement by a nondominant estate that is owned by someone with no possessory interest in the dominant estate.

The plaintiff also argues that, by virtue of the property interest it has in Clephane's property and Ogilvy's Belle Haven property, namely, the twenty foot right-of-way, it should be able to enjoy the easement appurtenant to those properties. Specifically, the plaintiff argues that, because it is "the owner of an interest in property located in Belle Haven, namely, [the twenty foot wide right-of-way], [it] enjoys the same rights to use Belle Haven's roads as any other owner, lessee or other assignee of property or an interest in property located in Belle Haven." This argument is unavailing.[9] A lessee,

[9] The plaintiff's reliance on *Sieger* v. *Riu*, 123 Conn. 343, 195 A. 735 (1937), is misplaced. The plaintiff relies on the following principle that we reiterated in *Sieger*: "As the [right-of-way over the private road] is annexed to the estate, for the benefit of which the easement or servitude is created, the right is not destroyed by a division of the estate to which it is appurtenant. And the owner or assignee of any portion of that estate may claim the right, so far as it is applicable to his part of the property, provided the right can be enjoyed as to the separate parcels without any additional charge or burden to the proprietor of the servient estate." (Internal quotation marks omitted.) Id., 347. Application of that principle was appropriate in *Sieger*, thereby giving rise to an easement by implication; id.; because the right-of-way at issue was appurtenant to the original dominant estate, which

unlike a holder of the benefit of an easement appurtenant, holds a possessory interest and may enjoy the benefit of the property that it possesses. See *Monarch Accounting Supplies, Inc.* v. *Prezioso*, 170 Conn. 659, 663–64, 368 A.2d 6 (1976) (lessee holds possessory interest); 1 Restatement (Third), supra, § 1.2 (1), p. 12 (easement holder does not hold possessory interest); see also 2 Restatement (Third), supra, § 5.2, p. 15 ("an appurtenant benefit or burden [generally] runs to all subsequent owners and possessors of the benefited and burdened property, including a lessee, life tenant, adverse possessor, and person who acquires title through a lien-foreclosure proceeding"); 2 Restatement (Third), supra, §§ 5.3 and 5.4. The rationale underlying that rule concerns the parties' intent: "It is . . . reasonable to assume that the parties who create servitudes intend that the benefits of appurtenant easements, profits, and restrictive covenants run to all subsequent possessors of the property." 2 Restatement (Third), supra, § 5.2, comment (a), p. 16; see also id., comment (a), pp. 16–17 (same as to burdens). The plaintiff therefore does not have "the same rights" as a lessee of Belle Haven property.

The plaintiff further argues that "[t]he defendants should be precluded from arguing that the deed from Nathaniel Witherell granting the subject easement was defective or that Witherell's transfer of the easement and the right to travel over the roads of Belle Haven constituted an overburdening because the defendants failed to raise these facts or arguments as special defenses." The defendants counter that they were not required to plead such arguments specially because: (1) they never argued that the deed by which Witherell granted the right-of-way to the Field Point Land Company was "defective"; and (2) the overburdening of the

subsequently had been divided into two parcels of property. Id., 344–45. *Sieger*, therefore, is readily distinguishable.

roads of Belle Haven that would have resulted was a matter of law. In light of our disposition of the plaintiff's more general claim and having carefully reviewed the defendants' arguments, we conclude that the defendants were not required to plead specially the arguments challenged by the plaintiff.

## II

The defendants next claim that the trial court improperly concluded, alternatively, that the plaintiff held an easement by implication over the roads of the Belle Haven Land Company. Specifically, the defendants argue that: (1) the trial court improperly concluded that, under the circumstances, Witherell had the legal right to grant the use of the Belle Haven roads; and (2) the trial court's factual findings, specifically, that the parties intended such an easement and that the easement was reasonably necessary for the enjoyment of the twenty foot wide right-of-way, were clearly erroneous. The plaintiff argues, however, that Witherell did have the legal right to grant the use of the roads, and that the trial court's factual findings were proper. The plaintiff also contends that the grant of the right to travel over the Belle Haven roads must be implied from the grant of the twenty foot wide right-of-way because otherwise such right-of-way over Clephane's property and Ogilvy's Belle Haven property would be useless. Because we agree with the defendants' first argument, namely, that the trial court improperly concluded that Witherell had the legal right to grant the use of the Belle Haven roads, we need not address its factual findings that the easement was intended by the parties and was reasonably necessary for the enjoyment of the twenty foot wide right-of-way.

Our disposition of this claim is straightforward in light of our conclusion in part I of this opinion. We will not construe a deed so as to provide an easement by

implication where the same could not have been expressly created by the party alleged to have intended the easement by implication. In other words, we will not conclude that there is an easement by implication, intended by Witherell, where he did not have the legal right to grant the use of the Belle Haven roads expressly, in the absence of conveying the property to which the use was appurtenant. See *Gager* v. *Carlson*, 146 Conn. 288, 293, 150 A.2d 302 (1959) (implied interests in land disfavored in order to assure safe reliance on land records).

A contrary conclusion would allow the dominant estate impermissibly to force the hand of the servient estate by creating additional burdens on the servient estate without the consent of the servient estate. Such a creation is impermissible. See *Richardson* v. *Tumbridge*, 111 Conn. 90, 96, 149 A. 241 (1930) (where easement granted in general terms, and location and manner of its use fixed definitely by owner of dominant estate, owner may not change location or use without consent of owner of servient estate); see also *Edgell* v. *Divver*, 402 A.2d 395, 397 (Del. Ch. 1979) ("[t]he primary restriction placed upon the owner of the dominant estate is that the burden created by the easement upon the servient estate cannot be materially increased, nor may new or additional burdens be imposed"); *Chevy Chase Land Co.* v. *United States*, 355 Md. 110, 152, 733 A.2d 1055 (1999) ("[i]t is 'the generally accepted rule that since an easement is a restriction upon the rights of the servient property owner, no alteration can be made by the owner of the dominant estate which would increase such restriction except by mutual consent of both parties' "); *Chevalier* v. *Tyler*, 118 Vt. 448, 455, 111 A.2d 722 (1955) ("the owner of an easement cannot materially increase the burden of it upon the servient estate, nor impose a new or additional burden thereon").

The following hypothetical situation illustrates our point: Assume five separately owned parcels of property, A through E, contiguous from west to east. The owner of parcel A seeks to cross parcels B, C and D, in order to reach his destination, parcel E, which he has permission to enter by the owner of parcel E. The owner of parcel B expressly grants the owner of parcel A a right-of-way "for all purposes of travel" that crosses over parcel B. The owners of parcels C and D refuse to grant rights-of-way over their parcels. Under the plaintiff's argument, the owner of parcel A would have an easement by implication over parcels C and D, without the consent of the owners thereof, solely because the right-of-way granted by the owner of parcel B, to cross over parcel B, would otherwise be useless. To adopt the plaintiff's rationale, therefore, would violate the well established principles that we articulated previously concerning easements, in particular, the fundamental principle that a property owner may not convey a property interest greater than what he owns.

The plaintiff, as did the trial court, improperly relies on *Toms* v. *Settipane*, 30 Conn. Sup. 374, 317 A.2d 467 (1973), and misconstrues the principles represented therein. In *Toms*, the plaintiff's predecessor in title originally owned a parcel of beach front property, a portion of which he subsequently conveyed to the defendants' predecessors in title,[10] " 'together with a right-of-way over a footpath to the beach . . . .' " Id., 376. The defendants' property otherwise had no access to the beach. The footpath was approximately eighteen inches wide. Id., 379. The area of the beach, to which the footpath led and of which the defendants sought use, was owned by the plaintiff. The trial court concluded that, based upon the easement granting a right-of-way over the footpath, the defendants had an easement by implica-

---

[10] Our references herein to the defendants in *Toms* are to Guy A. Settipane and Margaret K. Settipane.

tion that gave them the right to use the entire area of the plaintiff's beach. Id., 382. The trial court reasoned that it would be "preposterous . . . to construe the deed to the [defendants' predecessors in title] as creating an easement upon the beach limited to the width of the footpath, eighteen inches." Id., 381.

The plaintiff here improperly analogizes the use of Glenwood Drive to the use of the beach in *Toms*. The circumstances in *Toms* that gave rise to an implied easement are readily distinguishable from the present case. In *Toms*, the beach as well as the footpath was owned by the plaintiff, so that an easement by implication arose from the right-of-way granted by the plaintiff's predecessor in title, in keeping with the general rule cited by the trial court: "It is generally held that where a street or other way is called for as a boundary in a conveyance of land, and the grantor owns the fee in the land represented as the way or street, he is estopped, as against the grantee, to deny that the street or other way exists, and an easement in such way passes to the grantee by implication of law." (Internal quotation marks omitted.) Id., 380–81.

The plaintiff argues that an easement by implication must arise in the present case because "it would be absurd to construe this deed [granting the twenty foot wide right-of-way] as meaning that Nathaniel Witherell granted the Field Point Land Company the right to travel only to Glenwood Drive without the benefit of using this road to continue its travel from lots 7 and 8." Such a construction arguably would be absurd *had Witherell also owned Glenwood Drive* at the time of the grant. Only in that case would the situation in *Toms* be analogous.

### III

The defendants also claim that the trial court improperly concluded that, under the principles of *Whitton* v.

*Clark*, supra, 112 Conn. 28, Witherell, in his individual capacity, had the right to grant to the Field Point Land Company the use of the Belle Haven roads because the deed conveying the Belle Haven parcels from the Belle Haven Land Company to Witherell and Bruce, as trustees, made reference to a map of Belle Haven that illustrated Glenwood Drive and other Belle Haven roads. Specifically, the defendants argue that *Whitton* does not apply to the present case because the conveyor of the alleged implied easement over the roads of Belle Haven did not own such roads. The plaintiff contends, however, that *Whitton* does apply and that, by virtue of the map of Belle Haven, filed on the town land records by the Belle Haven Land Company, and the reference thereto in the deed conveying the Belle Haven parcels to Bruce and Witherell, as trustees, the Belle Haven Land Company conveyed an ownership interest in the roads, giving rise to an easement by implication. We agree with the defendants.

In *Whitton* v. *Clark*, supra, 112 Conn. 32–34, we stated that "the law is well settled that where an owner of land causes a map to be made of it upon which are delineated separate lots and streets and highways by which access may be had to them, and then sells the lots, referring in his conveyances to the map, the lot owners acquire the right to have the streets and highways thereafter kept open for use in connection with their lands. *Derby* v. *Alling*, 40 Conn. 410, 432 [1873]; *Pierce* v. *Roberts*, 57 Conn. 31, 38, 17 Atl. 275 [1889]; *Fisk* v. *Ley*, 76 Conn. 295, 300, 56 Atl. 559 [1903]; *Street* v. *Leete*, 79 Conn. 352, 358, 65 Atl. 373 [1906]. The courts are in decided conflict as to the extent to which any lot owner can claim that the streets plotted upon the map must remain subject to be opened for use. Some courts hold that he has a right to require this as to all streets plotted on the map. 1 Elliott on Roads & Streets (4th Ed.) § 132. Others restrict his right to such streets

or parts of streets as give him access to some other public way. *Reis* v. *New York*, 188 N.Y. 58, 73, 80 N.E. 573 [1907]. In *Derby* v. *Alling*, [supra, 432, we stated]: 'Where the owner of village property makes and publishes a map of it, with streets distinctly delineated, and then sells lots bounded on these streets, he comes under obligation to his vendees to open the streets to the public; the precise extent of the obligation being dependent on the particular circumstances of the case.' While thus we accept the principle that the right of a lot owner does not extend of necessity to all the streets in the tract delineated upon the map, we have not in that case or elsewhere attempted to fix the limits of his right. On the one hand, to restrict that right to such streets as will give him access to some other public way is to take too narrow a view, for it must fairly be assumed that he bought his lot in reliance upon the situation disclosed upon the map so far as it would be beneficial to him. On the other hand, to give to every lot owner in the tract the right to demand that every portion of a street delineated upon it shall be held subject to a future use for highway purposes, no matter how remote it may be from his premises, and how clear it may be that it will never be of any value to him, is to adopt a doctrine calculated to lay a dead hand upon the natural use, development and sale of property as the needs of a community may develop. This public policy forbids. If the doctrine in question be rested upon estoppel, as suggested in *Derby* v. *Alling*, [supra], 435, there is no sound reason to extend it as regards any lot owner to include streets which in any situation reasonably to be anticipated would not prove beneficial to him and from the deprivation of which he would suffer no injury. See *Bell* v. *Todd*, 51 Mich. 21, 28, 16 N.W. 304 [1883]. Or, if it be rested upon an implied covenant, as is sometimes stated, there is no occasion to extend that covenant beyond a situation which could in reason have furnished

an inducement to the purchase of the lot because of some benefit to accrue to it."

"The nature of the right obtained by the lot owner is that of an implied easement. See *Lake Garda Co.* v. *D'Arche*, [135 Conn. 449, 455, 66 A.2d 120 (1949)]; *Rischall* v. *Bauchmann*, 132 Conn. 637, 644, 46 A.2d 898 (1946)." *Stankiewicz* v. *Miami Beach Assn., Inc.*, 191 Conn. 165, 169, 464 A.2d 26 (1983). Courts have permitted such an easement by implication to arise under the circumstances described in *Whitton* v. *Clark*, supra, 112 Conn. 33–34, where: (1) under an estoppel theory, the party reasonably anticipated the use of the streets disclosed on the map that would prove beneficial to him; and (2) under an implied covenant theory, the use served as an inducement to the purchase of the lot.

In *Stankiewicz* v. *Miami Beach Assn., Inc.*, supra, 191 Conn. 170, we applied the principles represented in *Whitton* and stated: "When a conveyance describes the conveyed property by reference to a map on which streets are shown, an implied easement over the streets exists by law, if it exists at all, *only if the conveyor in fact owns the streets*." (Emphasis added.) Because the conveyor in *Stankiewicz* already had conveyed the property containing the streets by the time he made a subsequent conveyance and improperly referred to a map illustrating the streets, we concluded that an easement by implication did not exist, adhering to the principle that one cannot convey a greater interest than one owns. Id.

In *Whitton* and *Stankiewicz*, however, there was no suggestion, either express or implied, that the reference to a map illustrating streets conveyed the right to *transfer* or expand the implied right to use the streets. Moreover, "reference to a map in a conveyance normally is utilized merely as a descriptive tool to identify the property and, therefore, does not itself convey. See 23

Am. Jur. 2d, Deeds 232." *Stankiewicz* v. *Miami Beach Assn., Inc.*, supra, 191 Conn. 171.

In the present case, it is undisputed that, at the time of the grant of the right-of-way to the Field Point Land Company, Witherell had the right to use the Belle Haven roads. That right was described in the deed that created it, namely, the deed from the Belle Haven Land Company to Witherell and Bruce, as trustees, as "the right to use in common with others to whom such right has been or maybe hereafter granted by said Company, the ways and avenues of said company as the same may be necessary and convenient in passing to and from said premises hereby conveyed . . . ." What is disputed is Witherell's individual capacity to transfer that right in the absence of the conveyance of his property.

The plaintiff argues that the Belle Haven Land Company conveyed an ownership interest in the roads of Belle Haven when it conveyed the Belle Haven parcels to Witherell and Bruce, as trustees, referencing the map of Belle Haven, and accordingly, Witherell, as an individual successor in title, possessed an ownership interest in the Belle Haven roads. As stated previously, however, the right obtained by the lot owner, under the principles of *Whitton* v. *Clark*, supra, 112 Conn. 34, is in the nature of an implied easement. It is well settled that "[a]n easement creates a nonpossessory right to enter and use land in the possession of another and obligates the possessor not to interfere with the uses authorized by the easement." 1 Restatement (Third), supra, § 1.2 (1), p. 12. Furthermore, "[t]he benefit of an easement or profit is considered a nonpossessory interest in land because it generally authorizes limited uses of the burdened property for a particular purpose." Id., § 1.2, comment (d), pp. 14–15; see also *Russakoff* v. *Scruggs*, 241 Va. 135, 138, 400 S.E.2d 529 (1991) (easements are not ownership interests but rather privileges to use land of another in certain manner for certain purpose). The

plaintiff therefore does not have an ownership interest in the roads of Belle Haven.

## IV

The plaintiff argues that, even if we conclude that Witherell did not have the legal right to grant the right to travel over the Belle Haven roads, the judgment of the trial court nonetheless should be affirmed because the Belle Haven Land Company ratified Witherell's alleged grant of such right. We disagree.

The following additional facts are relevant to the disposition of the plaintiff's assertion. First, Witherell was a director, officer and shareholder of the Belle Haven Land Company and the Field Point Land Company at the time he granted the easement in favor of the Field Point Land Company. Second, in 1921, the Belle Haven Land Company caused to be filed in the town land records a map that bears the legend, "Map Showing Boundary Line Between Properties of The Belle Haven Land Company and Albert H. Wiggin[11] as Determined Dec. 1, 1920 . . . ." This map illustrates the twenty foot wide right-of-way granted by Witherell, bearing the legend "Right of Way" in the area of the easement.

The trial court made no findings as to whether the Belle Haven Land Company ratified Witherell's alleged grant of the right to use the Belle Haven roads. The plaintiff, however, relying on the facts that we have just recited, argues that, as a matter of law, the record so conclusively establishes that ratification occurred that no reasonable fact finder could find otherwise. Specifically, the plaintiff contends that, by virtue of Witherell's roles in both the Belle Haven Land Company and the Field Point Land Company, the Belle Haven Land Company had notice of the facts surrounding the grant and

[11] Wiggin was a former owner of lot 8 in Field Point.

later ratified it through its acts and omissions. The plaintiff further argues that the map, described previously, indicates that the Belle Haven Land Company knew about the easement and that it was intended to be a right-of-way from lots 7 and 8 to Glenwood Drive, and ratified such grant by filing the map and by failing to record an objection thereto on the land records.

"As a general rule, [r]atification is defined as the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account. . . . Ratification requires acceptance of the results of the act with an intent to ratify, and with full knowledge of all the material circumstances. . . . *Russell* v. *Dean Witter Reynolds, Inc.*, 200 Conn. 172, 185, 510 A.2d 972 (1986)." (Internal quotation marks omitted.) *Community Collaborative of Bridgeport, Inc.* v. *Ganim*, 241 Conn. 546, 561, 698 A.2d 245 (1997). "If the officers or the agents of a corporation assume to act for the corporation without any authority at all, or if they exceed their authority or act irregularly, and the act is one which could have been authorized in the first instance by the stockholders, board of directors or subordinate officers, as the case may be, it may be expressly or impliedly ratified by them, and thus be rendered just as binding . . . ." (Internal quotation marks omitted.) *Cohen* v. *Holloways', Inc.*, 158 Conn. 395, 407–408, 260 A.2d 573 (1969). "In order to ratify the unauthorized act of an agent and make it effectual and obligatory upon the principal, the general rule is that the ratification must be made by the principal with a full and complete knowledge of all the material facts connected with the transaction to which it relates; and this rule applies, of course, to ratification by a corporation of an unauthorized contract or other act by its officers or agents, whether the ratification is by the stockholders or by the directors, or by a subordinate

officer having authority to ratify. . . . *Cohen* v. *Holloways', Inc.*, supra, [408].

"We recognize that [a]uthority in the agent of a corporation may be inferred from the conduct of its affairs, or from the knowledge of its directors and their neglect to make objection. *Mahoney* v. *Hartford Investment Corp.*, 82 Conn. 280, 286, 73 A. 766 (1909). Indeed, we have stated that [s]ilence, as well as affirmative acts, may imply an intent to ratify. *Hartford Accident & Indemnity Co.* v. *South Windsor Bank & Trust Co.*, 171 Conn. 63, 72, 368 A.2d 76 (1976); see *Young* v. *Data Switch Corp.*, 231 Conn. 95, 102, 646 A.2d 852 (1994); see also 18B Am. Jur. 2d 505, Corporations § 1653 (1985) ([a] corporation may ratify an unauthorized act of its agent by passive acquiescence as well as by affirmative action). The nature and extent of an agent's authority is a question of fact for the trier where the evidence is conflicting or where there are several reasonable inferences which can be drawn. *E. Paul Kovacs & Co.* v. *Alpert*, 180 Conn. 120, 126, 429 A.2d 829 (1980). Since ratification in a given case depends ultimately upon the intention with which the act or acts, from which ratification is claimed, were done, and since intention is a mental fact and its finding clearly one of fact, the finding in a given case of ratification is one of fact and not reviewable unless the conclusion of ratification, drawn from the facts, is plainly erroneous. *McDermott* v. *McDermott*, 97 Conn. 31, 37, 115 A. 638 (1921)." (Internal quotation marks omitted.) *Community Collaborative of Bridgeport, Inc.* v. *Ganim*, supra, 241 Conn. 561–62.

We conclude that, although the intention of the party whose conduct is sought to be deemed a ratification is generally a question of fact, those facts upon which the plaintiff relies are insufficient, as a matter of law, to support the assertion that the Belle Haven Land Company ratified the alleged grant by Witherell to the Field

Point Land Company of the right to use the Belle Haven roads. Although the grant of the use of Belle Haven roads was the type of grant that "could have been authorized in the first instance"; *Cohen* v. *Holloways', Inc.*, supra, 158 Conn. 407; by the Belle Haven Land Company, that alone is insufficient to support a conclusion of ratification. The map upon which the plaintiff relies in no way suggests that the predecessors in title of the plaintiff's property and Ogilvy's Field Point property had the right to use Glenwood Drive. Instead, the map accurately reflects the twenty foot wide right-of-way as a burden on the property over which it crosses. Furthermore, the filing of the map by the Belle Haven Land Company was, as the legend on the map indicates, filed for the purpose of establishing the boundary line between Belle Haven and a certain parcel in Field Point.

Furthermore, the defendants do not dispute that the grant by Witherell to the Field Point Land Company of the twenty foot wide right-of-way—construed as granting the right to travel over Witherell's property, but not onto Glenwood Drive—was a valid conveyance. The map upon which the plaintiff relies establishes only that the Belle Haven Land Company acknowledged the conveyance just described. It is too attenuated a proposition, however, that, by acknowledging the twenty foot wide right-of-way that crossed over what had been Witherell's property, the Belle Haven Land Company intended to consent to any overburdening of its property, namely, Glenwood Drive, by Witherell who, in his individual capacity, did not have the authority to add an additional burden to the servient estate.

V

We next address the plaintiff's argument that, pursuant to the act; General Statutes §§ 47-33b through 47-

33*l*;[12] it holds marketable title to the twenty foot right-

[12] General Statutes § 47-33b provides: "Marketable record title. Definitions. As used in sections 47-33b to 47-33*l*, inclusive:

"(a) 'Marketable record title' means a title of record which operates to extinguish such interests and claims, existing prior to the effective date of the root of title, as are stated in section 47-33e;

"(b) 'Records' means the land records of the town where the particular land is located;

"(c) 'Recorded' means recorded as provided by section 47-10 or section 49-5, as the case may be;

"(d) 'Person dealing with land' includes a purchaser of any estate or interest therein, a mortgagee, an attaching or judgment creditor, a land contract vendee, or any other person seeking to acquire an estate or interest therein, or impose a lien thereon;

"(e) 'Root of title' means that conveyance or other title transaction in the chain of title of a person, purporting to create or containing language sufficient to transfer the interest claimed by such person, upon which he relies as a basis for the marketability of his title, and which was the most recent to be recorded as of a date forty years prior to the time when marketability is being determined. The effective date of the root of title is the date on which it is recorded;

"(f) 'Title transaction' means any transaction affecting title to any interest in land, including, but not limited to, title by will or descent, by public sale, by trustee's, referee's, guardian's, executor's, administrator's, conservator's or committee deed, by warranty or quitclaim deed, by mortgage or by decree of any court."

General Statutes § 47-33c provides: "Chain of title for not less than forty years creates marketable record title. Any person having the legal capacity to own land in this state, who has an unbroken chain of title to any interest in land for forty years or more, shall be deemed to have a marketable record title to that interest, subject only to the matters stated in section 47-33d. A person has such an unbroken chain of title when the land records of the town in which the land is located disclose a conveyance or other title transaction, of record not less than forty years at the time the marketability is to be determined, which conveyance or other title transaction purports to create such interest in land, or which contains language sufficient to transfer the interest, either in (1) the person claiming that interest, or (2) some other person from whom, by one or more conveyances or other title transactions of record, the purported interest has become vested in the person claiming the interest; with nothing appearing of record, in either case, purporting to divest the claimant of the purported interest."

General Statutes § 47-33d provides: "Interests to which title is subject. Such marketable record title is subject to: (1) All interests and defects which are created by or arise out of the muniments of which the chain of record title is formed; provided a general reference in the muniments, or any of them, to easements, use restrictions or other interests created prior to the

of-way and the right to travel over the Belle Haven

root of title are not sufficient to preserve them, unless specific identification is made therein of a recorded title transaction which creates the easement, use restriction or other interest; (2) all interests preserved by the recording of proper notice or by possession by the same owner continuously for a period of forty years or more, in accordance with section 47-33f; (3) the rights of any person arising from a period of adverse possession or use, which was in whole or in part subsequent to the effective date of the root of title; (4) any interest arising out of a title transaction which has been recorded subsequent to the effective date of the root of title from which the unbroken chain of title of record is started; provided such recording shall not revive or give validity to any interest which has been extinguished prior to the time of the recording by the operation of section 47-33e; (5) the exceptions stated in section 47-33h as to rights of reversioners in leases, as to apparent easements and interests in the nature of easements, and as to interests of the United States, this state and political subdivisions thereof, public service companies and natural gas companies."

General Statutes § 47-33e provides: "Prior interests void. Subject to the matters stated in section 47-33d, such marketable record title shall be held by its owner and shall be taken by any person dealing with the land free and clear of all interests, claims or charges whatsoever, the existence of which depends upon any act, transaction, event or omission that occurred prior to the effective date of the root of title. All such interests, claims or charges, however denominated, whether legal or equitable, present or future, whether those interests, claims or charges are asserted by a person sui juris or under a disability, whether that person is within or without the state, whether that person is natural or corporate, or is private or governmental, are hereby declared to be null and void."

General Statutes § 47-33f provides: "Notice of claim filed within forty-year period. (a) Any person claiming an interest of any kind in land may preserve and keep effective that interest by recording, during the forty-year period immediately following the effective date of the root of title of the person whose record title would otherwise be marketable, a notice in writing, duly verified by oath, setting forth the nature of the claim. No disability or lack of knowledge of any kind on the part of anyone suspends the running of the forty-year period. Such notice may be recorded by the claimant or by any other person acting on behalf of any claimant who is: (1) Under a disability, (2) unable to assert a claim on his own behalf or (3) one of a class, but whose identity cannot be established or is uncertain at the time of filing such notice of claim for record.

"(b) If the same record owner of any possessory interest in land has been in possession of that land continuously for a period of forty years or more, during which period no title transaction with respect to the interest appears of record in his chain of title and no notice has been recorded by him or on his behalf as provided in subsection (a) of this section, and the possession continues to the time when marketability is being determined, that period

of possession shall be deemed equivalent to the recording of the notice immediately preceding the termination of the forty-year period described in subsection (a) of this section."

General Statutes § 47-33g provides: "Contents of notice. Recording. Indexing. (a) To be effective and to be entitled to recordation, the notice referred to in section 47-33f shall contain an accurate and full description of all land affected by the notice, which description shall be set forth in particular terms and not by general inclusions; but, if the claim asserted under section 47-33f is founded upon a recorded instrument, the description in the notice may be the same as that contained in the recorded instrument. In addition, each notice shall clearly state the then owner or owners of record of the property involved.

"(b) Each notice shall be recorded in the land records of the town where the land described therein is located. The notice shall be indexed in the grantors' index under the name or names of the owners of record as listed in the notice and in the grantees' index under the name of the claimant appearing in the notice."

General Statutes § 47-33h provides: "Excepted interests. Sections 47-33b to 47-33l, inclusive, shall not be applied to bar any lessor or his successor as a reversioner of his right to possession on the expiration of any lease or to bar or extinguish any easement or interest in the nature of an easement, or any rights granted, excepted or reserved by the instrument creating such easement or interest, including any right for future use, if the existence of such easement or interest is evidenced by the location beneath, upon or above any part of the land described in such instrument of any pipe, valve, road, wire, cable, conduit, duct, sewer, track, hole, tower or other physical facility and whether or not the existence of such facility is observable, or to bar, extinguish or otherwise affect any interest of the United States, of this state or any political subdivision thereof, of any public service company as defined in section 16-1 or of any natural gas company."

General Statutes § 47-33i provides: "Other statutes not affected. Nothing contained in sections 47-33b to 47-33l, inclusive, shall be construed to extend the period for bringing an action or for doing any other required act under any statute of limitation, nor, except as herein specifically provided, to affect the operation of any statute governing the effect of the recording or the failure to record any instrument affecting land."

General Statutes § 47-33j provides: "Notice not to be recorded to slander title. Damages. No person may use the privilege of recording notices under sections 47-33f and 47-33g for the purpose of slandering the title to land. In any action brought for the purpose of quieting title to land, if the court finds that any person has recorded a claim for that purpose only, the court shall award the plaintiff all the costs of the action, including such attorneys' fees as the court may allow to the plaintiff, and in addition, shall decree that the defendant asserting the claim shall pay to the plaintiff all damages the plaintiff may have sustained as the result of such notice of claim having been so recorded."

roads.[13] Specifically, the plaintiff argues that the act has extinguished the Belle Haven Land Company's arguments that: (1) Witherell could not have granted the right to travel over Belle Haven roads; and (2) such an alleged grant constituted an overburdening of the roads. Similarly, the plaintiff argues that the act extinguishes any defects arising out of the grant of the easement from Witherell to the Field Point Land Company. The defendants argue, to the contrary, that the act is inapplicable to the present case. We agree with the defendants.

Pursuant to the act, "any person who has an unbroken record chain of title to an interest in land for a period of forty years, plus any additional period of time necessary to trace the title back to the latest connecting title instrument of·earlier record (which is the 'root of title' under the act) has a 'marketable record title' subject only to those pre-root of title matters that are excepted under the statute or are caused to reappear in the latest forty year record chain of title." *Mizla* v. *Depalo*, 183 Conn. 59, 64, 438 A.2d 820 (1981). The act "declares null and void any interest in real property not specifically described in the deed to the property which it purports to affect, unless within a forty year period, a notice specifically reciting the claimed interest is placed on the land records in the affected land's chain of title." *Schulz* v. *Syvertsen*, 219 Conn. 81, 84, 591 A.2d 804 (1991).

General Statutes § 47-33k provides: "Construction. Sections 47-33b to 47-33*l*, inclusive, shall be liberally construed to effect the legislative purpose of simplifying and facilitating land title transactions by allowing persons to rely on a record chain of title as described in section 47-33c, subject only to such limitations as appear in section 47-33d."

General Statutes § 47-33*l* provides: "Forty-year period extended, when. If the forty-year period specified in sections 47-33b to 47-33k, inclusive, has expired prior to two years after July 1, 1969, such period shall be extended two years after July 1, 1969."

[13] Because it concluded that the plaintiff had the right to use the roads of the Belle Haven Land Company, the trial court did not address the applicability of the act.

" '[T]he ultimate purpose of all the Marketable Title Acts is to simplify land title transactions through making it possible to determine marketability by limited title searches over some reasonable period of the immediate past and thus avoid the necessity of examining the record back into distant time for each new transaction.' " *Mizla* v. *Depalo*, supra, 183 Conn. 64 n.9, quoting P. Basye, Clearing Land Titles (2d Ed. 1970) § 172, p. 368. "Marketable-title acts are designed to decrease the costs of title assurance by limiting the period of time that must be covered by a title search." 2 Restatement (Third), supra, § 7.16, comment (a), p. 458.

The plaintiff alleged that it possesses an unbroken chain of title to the twenty foot wide right-of-way and the right to travel over the roads of Belle Haven for the act's requisite forty year period. The plaintiff primarily relies, as its root of title,[14] on a deed from Frederick A. Hubbard to Lydia B. Froment, dated February 5, 1904, which conveyed lot 7, together with the twenty foot wide right-of-way. The plaintiff secondarily relies on the deed from Kerner Easton to Margaret S. Easton, dated September 4, 1945, which conveyed lot 7, together with "all appurtenances thereto . . . ."

As discussed previously, however, in part I of this opinion, Witherell did not have the legal right to create an easement in favor of the Field Point Land Company granting the right to use the Belle Haven roads.[15] Witherell only had the right to travel over the Belle Haven roads as it appertained to his ownership of the dominant estate. He did not own the right to travel over the Belle Haven roads separate from that ownership. We therefore will not construe language in a deed that transfers

[14] Under the act, the "root of title" must "[purport] to create or [contain] language sufficient to transfer the interest claimed by" the plaintiff. General Statutes § 47-33b (e); see General Statutes § 47-33c.

[15] See part I of this opinion for a discussion of the prohibition against extending the benefit of an easement appurtenance to a nondominant estate.

a property interest as transferring an interest greater than that which was created. See *Powers* v. *Olson*, 252 Conn. 98, 109 n.6, 742 A.2d 799 (2000) ("one cannot convey greater title than that which one possesses"); *Stankiewicz* v. *Miami Beach Assn., Inc.*, supra, 191 Conn. 170 (same). The plaintiff therefore cannot establish what constitutes its root of title for its alleged right to use the Belle Haven roads.

Thus, the plaintiff impermissibly attempts to use the act affirmatively to create a property interest that did not otherwise exist.[16] We have never applied the act so as to *create* an easement that otherwise did not exist, or to preclude a party involved in a quiet title action from claiming that the party asserting the interest or its predecessor in title never held the asserted interest.[17] That is not the function of the act, nor would it serve the purpose of the act, which we previously have described, to apply it in such a manner. Instead, in keeping with its purpose, the act, subject to certain exceptions, functions to extinguish those property interests *that once existed,* and would still exist but for the absence from the land records in the affected property's chain of title of a notice specifically reciting the claimed interest. *Schulz* v. *Syvertsen*, supra, 219 Conn. 84; *Mizla* v. *Depalo*, supra, 183 Conn. 66. In light of our conclusion in part I of this opinion that the plaintiff does not have the property interest that it

---

[16] In that connection, the plaintiff misconstrues the defendants' claim as one challenging "alleged defects contained within the transfer" of the easement from Witherell to the Field Point Land Company. At no point, however, have the defendants argued that "defects" exist in the deed creating the twenty foot right-of-way. Instead, the defendants repeatedly acknowledge the plaintiff's right-of-way over Clephane's property and Ogilvy's Belle Haven property. Their claim is that, as a matter of law, the easement asserted by the plaintiff—the right to use the Belle Haven roads—could not have been granted in the manner theorized by the plaintiff.

[17] At oral argument before this court, the plaintiff conceded that application of the act would still require the determination of the type of easement held by the plaintiff.

asserts, namely, the right to traverse the roads of the Belle Haven Land Company, the act is inapplicable to the present case.

## VI

Finally, the plaintiff claims that, if we reverse the judgment of the trial court, we should order a new trial on the issues of: (1) whether the Belle Haven Land Company is a political subdivision of the state; and (2) if so, whether it has violated the plaintiff's federal and state constitutional rights to travel by prohibiting it from traveling on Belle Haven roads. The defendants argue that the plaintiff's claim fails because they withdrew their argument that the Belle Haven Land Company was a political subdivision of the state and the plaintiff never pleaded a violation of its constitutional rights. We agree with the defendants.

At trial, the defendants initially argued, in response to the plaintiff's claim that the act applied, that the Belle Haven Land Company was a political subdivision so as to avoid the applicability of the act. See General Statutes § 47-33h.[18] The defendants, however, subsequently withdrew this argument. At no point in the proceedings before the trial court did the plaintiff plead or otherwise claim that the defendants had violated its constitutional right to travel. Furthermore, the plaintiff never adopted as its own, as it could have done, the argument, which was made only temporarily by the defendants as a counterargument, that the Belle Haven Land Company was a political subdivision of the state. Furthermore, it was implicit in the plaintiff's claim that the act applied to the present case, that the plaintiff's argument was *not* that the Belle Haven Land Company

---

[18] To that end, the defendants offered the testimony of Charles F. Barber, a former director of the Belle Haven Land Company and a member of the Belle Haven Landowners Association, and introduced the bylaws of the Belle Haven Tax District.

was a political subdivision of the state. We reject the plaintiff's effort on appeal to secure a second opportunity at making, for the first time, such a constitutional claim.

Our refusal to do so is analogous to our general refusal to review an issue that has not been properly raised before the trial court. See *Bell Atlantic Mobile, Inc.* v. *Dept. of Public Utility Control*, 253 Conn. 453, 485, 753 A.2d 361 (2000) ("we ordinarily will not review an issue that has not been properly raised before the trial court"); *Santopietro* v. *New Haven*, 239 Conn. 207, 219–20, 682 A.2d 106 (1996) (court "not required to consider any claim that was not properly preserved in the trial court"); *Yale University* v. *Blumenthal*, 225 Conn. 32, 36 n.4, 621 A.2d 1304 (1993) (court declined to consider issues briefed on appeal but not raised at trial); see also Practice Book § 60-5 ("court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial").

The judgment is reversed and the case is remanded with direction to render judgment for the defendants.

In this opinion the other justices concurred.